UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.
## 08-22582-CIV-MOORE/SIMONTON

ATHLETE'S FOOT BRANDS, LLC; and
NEXCEN BRANDS, INC.,

      Plaintiffs,

v.

TURNER PHASE IV, LLC;
TURNER PHASE V, LLC;
DELON TURNER;
TONYA BAKER-TURNER; and
SABRINA BAKER-BOUIE,

    Defendants.

_____/

```
FILED by  IG  D.C.
ELECTRONIC

SEPT 17, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI
```

### COMPLAINT FOR
### INJUNCTIVE RELIEF AND OTHER RELIEF

Plaintiffs, Athlete's Foot Brands, LLC ("Athlete's Foot") and NexCen Brands, Inc. ("NexCen") (collectively, "Plaintiffs'), sue Defendants, Turner Phase IV, LLC ("Phase IV"), Turner Phase V, LLC ("Phase V"), Delon Turner, Tonya Baker-Turner, and Sabrina Baker-Bouie, and allege:

### NATURE OF THE CASE

1. This is a civil action brought by a franchisor, Athlete's Foot, against Defendants, former franchisees, for, <u>inter alia,</u> infringement of trademarks, unfair competition, and breach of contract, including for violations of a non-competition covenant and a failure to pay royalties that are due and owing.

1

## PARTIES

2.     Plaintiff Athlete's Foot is a Delaware limited liability company organized under the laws of Delaware with a principal place of business in the State of Georgia, and a subsidiary of NexCen.

3.     Plaintiff NexCen is a business incorporated under the laws of Delaware with its principal place of business in the State of New York.  It acquired Athlete's Foot in or around November 2006.

4.     Defendant Phase IV is a limited liability company organized under the laws of and doing business in the State of Florida.

5.     Defendant Phase V is a limited liability company organized under the laws of and doing business in the State of Florida.

6.     Defendant Delon Turner is an individual and a citizen and resident of the State of Florida.

7.     Defendant Tonya Baker-Turner is an individual and a citizen and resident of the State of Florida.

8.     Defendant Sabrina Baker-Bouie is an individual and a citizen and resident of the State of Florida.

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction over the federal claims in this action inter alia pursuant to 28 U.S.C. §§ 1331, 1332, and 1338, for federal question jurisdiction and diversity jurisdiction, and has supplemental subject matter jurisdiction over the state claims in this action inter alia pursuant to 28 U.S.C. § 1367(a).

2

Astigarraga Davis Mullins & Grossman, P.A.

10.   Venue over this action properly lies in this District inter alia pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2) because all Defendants reside in Florida and at least one Defendant resides in this District, and because a substantial part of the events or omissions giving rise to the claims here occurred in this District.  Venue also is proper in this District pursuant to 28 U.S.C. § 1400 (a), as this action arises out of an Act of Congress relating to copyrights or exclusive rights in designs and at least one Defendant resides in this District or may be found in it.

11.   All conditions precedent to this action have been met, waived, or excused.

## FACTS

### Overview

12.   Plaintiff Athlete's Foot and its predecessors are and have been engaged in the business of franchising special retail athletic footwear stores for decades.

13.   Plaintiff Athlete's Foot owns and continuously has used, itself and via its assignors and predecessors, various United States trademarks and service marks, including THE ATHLETE'S FOOT® per se and in the form of a winged foot (among the forms are those shown in attached Exhibit A), and it uses these trademarks and service marks in its specialty retail athletic footwear stores (the "Mark").

14.   Among the numerous trademark registrations comprising the Mark that Athlete's Foot owns are:

| Mark | Code | Registration No. | Last Registration Date |
|---|---|---|---|
| THE ATHLETE'S FOOT | DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS | 2308686 | January 18, 2000 |
| THE ATHLETE'S FOOT | TYPED DRAWING | 2209347 | December 8, 1998 |
| THE ATHLETE'S FOOT | TYPED DRAWING | 1634135 | February 5, 1991 |
| THE ATHLETE'S FOOT | DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS | 1632670 | January 22, 1991 |
| THE ATHLETE'S FOOT | TYPED DRAWING | 1631948 | January 15, 1991 |

3

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

| THE ATHLETE'S FOOT | DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS | 1631686 | January 15, 1991 |
|---|---|---|---|
| THE ATHLETE'S FOOT | TYPED DRAWING | 1094685 | June 27, 1978 |

Athlete's Foot has obtained the exclusive right to use, promote, and license the Mark in connection with Athlete's Foot franchises. The Mark is registered with the United States Patent and Trademark Office, and all necessary affidavits of use have been filed. True and correct copies of these registrations taken from the United States Patent and Trademark Office website (www.uspto.gov) are attached as Composite Exhibit B.

15.    Plaintiff Athlete's Foot also owns and uses a unique franchise system that includes store layout, signage and decor, which enable its many franchise locations to have uniform features (the "System"). Among the distinctive features of this System are particular interior and exterior store layouts, signage, design and décor, including wall treatment and color scheme, special seating, and other floor fixtures and decorative display items. These and other features of the System comprise the franchises' "Trade Dress", which was described in the contracts between Plaintiffs and Defendants and which is described here through Exhibit C.

16.    Through the System, franchisees are provided with various means of training and support and are helped to ensure that each franchised store is sufficiently uniform with others. This training, support, and assistance both help the individual franchisees succeed and enhance the value of the Mark by promoting uniformity and success among the stores.

17.    As part of the System, franchisees ordinarily are granted a limited license that allows them to use the Mark in some way in connection with each franchised store. Use of the Mark under such licenses, however, is not permitted if the franchise agreement is terminated for whatever reason.

4

18.    In exchange for the benefits of the Mark, the System, the Trade Dress, and other incidentals of Plaintiffs' brand name and goodwill, Defendants agreed to, _inter alia_, make certain royalty payments to Plaintiffs and refrain from certain types of competition.

19.    Plaintiffs have spent vast quantities of time, money, and resources developing their brand recognition and valuable goodwill.  Indeed, today Plaintiff Athlete's Foot, the world's first franchisor of athletic footwear stores, is recognized as a world leader in athletic footwear franchising, and today there are hundreds of Athlete's Foot franchises throughout the world.

## Defendants Become Franchisees of Plaintiff Athlete's Foot

## The 163rd Street Franchise

20.    On or about December 1, 2005, Defendant Phase V entered into a franchise Operating Agreement with an effective date of March 28, 2005, for an Athlete's Foot® franchise store at the 163rd Street Mall.  A true and correct copy of this Agreement (the "163rd Agreement") is attached hereto as Exhibit D.  The other parties to this Agreement were Athlete's Foot Brands, Inc., and Athlete's Foot Marketing Associates, LLC.  These entities, and the rights of these entities, now are owned by Plaintiff NexCen.

21.    Defendant Delon Turner executed the 163rd Agreement on behalf of Defendant Phase V.

22.    Defendant Delon Turner separately executed a Member Guaranty, on December 1, 2005.  This Guaranty, which was attached to the 163rd Agreement, also bore an effective date of March 28, 2005.  A true and correct copy of the Member Guaranty is part of Exhibit D.

23.    Pursuant to the 163rd Agreement, Defendants Phase V and Delon Turner were granted certain franchise rights, some of which are listed in Section 2 of the Agreement.  Among

Astigarraga Davis Mullins & Grossman, P.A.

these rights was a license to use the Mark in connection with the 163rd Store.  163rd Agreement, Art. 2.1(a).

24.     Defendants' license of the Mark, however, was limited by several other provisions of the 163rd Agreement, including those under Section 12, entitled "Company's Obligations on Termination."[1]  For instance, Article 12.1(a) states that upon the expiration or termination of the Agreement, Defendants were to "[d]iscontinue all use of the Mark, all use of the System, all use of any of AFB's copyrights or the distinctive features of the AFB Trade Dress used in connection with the Mark and all use of any goods, bags or supplies bearing the Mark and make disposition of the AFB Trade Dress."

25.     Along with rights bestowed to Defendants Phase V and Delon Turner, the 163rd Agreement also imposed several obligations on them.  For instance, royalty payments were to be paid to Plaintiffs on a monthly basis.  Art. 3.1(a)(ii).  Another such obligation was to make certain reports to Plaintiffs regarding the general status of the store.  Art. 3.2.

26.     Defendants Phase V and Delon Turner also agreed to abide by non-compete provisions found in the 163rd Agreement.  For example, for one year after expiration or termination of the Agreement, Defendants were not to engage in the sale of footwear, athletic apparel, and other kinds of products or services that would be competitive with the types of products within a certain radius from the former franchise.  Arts. 1.1(f), 12.2.

27.     With the consent of Plaintiffs and under the terms and conditions of the 163rd Agreement, Defendants commenced the operation of an Athlete's Foot® franchise store at 1263 NE 163rd Street, No. 1020, North Miami, FL 33162 (the "163rd Store").

28.     Defendants thereafter operated the 163rd Store and in doing so enjoyed the benefits of the Mark, the System, and Trade Dress.

---

[1] "Company" refers to the franchisees, Defendants Phase V and Delon Turner.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

**The Southland Mall Franchise**

29.     On July 31, 2003, Defendant Phase IV entered into a franchise Operating Agreement for a franchise store at the Cutler Ridge Mall (a/k/a Southland Mall).  A true and correct copy of this Agreement (the "Southland Agreement") is attached hereto as Exhibit E.  As with the 163rd Agreement, the other parties to this Agreement were Athlete's Foot Brands, Inc., and Athlete's Foot Marketing Associates, LLC.  These entities, and the rights of these entities, now are owned by Plaintiff NexCen.

30.     Defendant Delon Turner executed the Southland Agreement on behalf of Defendant Phase IV.

31.     Defendant Delon Turner, along with Defendants Tonya Baker-Turner and Sabrina Baker-Bouie, separately executed a Member Guaranty, on July 31, 2003.  This Guaranty was attached to the Southland Agreement.  A true and correct copy of the Member Guaranty is part of Exhibit E.

32.     Subsequently, on November 25, 2003, Defendant Phase IV, through the signature of Defendant Delon Turner, entered into an amendment of the Southland Agreement.[2]  This amendment, entitled First Amendment to Operating Agreement ("First Amendment"), modified the Southland Agreement in various ways but otherwise ratified the Southland Agreement in its entirety.  A true and correct copy of the First Amendment is attached hereto as Exhibit F.

33.     The Southland Agreement was structurally and substantively similar to the 163rd Agreement.  For instance, it, too, granted Defendants a limited license for the use of the Mark, Art. 2.1(a), but similarly required that Defendants cease the use of the Mark upon the expiration or termination of the Agreement, Art. 12.1(a).

---

[2] The parties to this amendment were the same as those of the Southland Agreement.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

34.     The Southland Agreement also imposed various obligations upon Defendants with regard to the operating the Southland Athlete's Foot® franchise, including making royalty payments, Art. 3.1(b)(i), and making certain reports to Plaintiffs, Art. 3.2.

35.     Defendants also similarly agreed to abide by non-compete provisions, including ones prohibiting the sale of footwear, athletic apparel, and other kinds of products or services that would be competitive with the types of products within a certain radius from the former franchise for one year following the expiration or termination of the Agreement.  Arts. 1.1(e), 12.2.

36.     With the consent of Plaintiffs and under the terms and conditions of the Southland Agreement, Defendants commenced the operation of an Athlete's Foot® franchise store at 20505 S. Dixie Hwy., No. 1115, Miramar, FL 33189 (the "Southland Store").

37.     Defendants thereafter operated the Southland Store and in doing so enjoyed the benefits of the Mark, the System, and Trade Dress.

### Defendants' Breaches of Their Contractual Obligations

38.     Defendants Phase V and Delon Turner have failed to fulfill certain of their contractual obligations under the 163rd Agreement.  Among other things, these Defendants failed to make royalty payments as required under Article 3.1(a)(ii)(1), failed to pay marketing fees as required under Article 3.1(b), and failed to properly make reports about the store as required under Section 3.2.

39.     Defendants Phase IV, Delon Turner, Tonya Baker-Turner and Sabrina Baker-Bouie also failed to fulfill certain of their contractual obligations under the Southland Agreement.  Among other things, these Defendants failed to make royalty payments as required under Article 3.1(b)(i), failed to pay marketing fees as required under Article 3.1(c), and failed to property make reports about the store as required under Section 3.2.

8

40.     As a result of these contractual breaches, on May 13, 2008, Plaintiffs, consistent with Section 10.1 of the 163rd Agreement and the Southland Agreement, issued to Defendants a written, formal Notice of Default ("Default Notice"), a true and correct copy of which is attached hereto as Exhibit G.  The Default Notice identified the particular provisions of the 163rd Agreement and Southland Agreement of which Defendants were in violation, made demand for the violations to be remedied, and further stated, "If you do not comply with this letter within the specified timeframe, Athlete's Foot intends to terminate the Operating Agreements and all rights granted therein, as well as commence legal proceedings against you and any guarantors under the Operating Agreements to enforce its rights under the Operating Agreements and guarantees, including its right to obtain all direct and indirect damages incurred by Athlete's Foot."

41.     Defendants failed to remedy the violations of the 163rd Agreement and the Southland Agreement.  Accordingly, on June 11, 2008, Plaintiffs, consistent with Section 10.1, including without limitation Art. 10.1(a), issued to Defendants a formal Notice of Termination ("Termination Notice"), a true and correct copy of which is attached hereto as Exhibit H.

42.     The Termination Notice, inter alia, provided:

> **We have made numerous attempts to contact you over the past several months to demand your compliance with the payment and reporting provisions of the Operating Agreements**. Due to your refusal to comply with those obligations, we hereby terminate the Operating Agreements and all rights granted thereunder effective upon receipt of this letter (the "Effective Date").
> ***
> Pursuant to Sections 12.1, 12.3 and 12.4 of the Operating Agreements, the Franchisor hereby demands that you and the guarantors: **(i) immediately cease all use of the Athlete's Foot® marks and the Athlete's Foot's system and proprietary methods, procedures and techniques;** (ii) within three business days after receipt of this letter, return to the Franchisor all copies of its confidential operations manuals and other proprietary information that have been previously delivered or made available to you; and (iii) take all actions necessary to disconnect all telephone numbers used in connection with the store within 24 hours of your receipt of this letter.

9

**We also demand that you take all actions necessary to disassociate your store from Athlete's Foot**, including the removal of all indoor and out door signage, and all menu boards and other items bearing the Athlete's Foot mark or that are part of Athlete's Foot's trade dress within 14 days after the date of this letter; which includes displays, decor, wallpaper and wall murals.

(emphasis added).

43.     The Termination Notice also demanded that Defendants remit the outstanding royalty and advertising fees, $73,889.54 and $24,813.11, respectively.

**Defendants' Failure to Cease Use of the Mark and Other Proprietary Information**

44.     Despite the Termination Notice, Plaintiffs recently came to learn that Defendants had not, <u>inter alia</u>, ceased use of the Mark, the System, or the Trade Dress, nor to generally dissociate themselves with the Athlete's Foot® Marks and brands.  Defendants also continue to have failed to make the past due and owed royalty payments.

45.     Accordingly, on July 23, 2008, Plaintiffs issued to Defendants a formal Notice of Infringement ("Infringement Notice"), a copy of which is attached hereto as <u>Exhibit I</u>.

46.     This Infringement Notice provided, <u>inter alia</u>:

We have learned that you continue to maintain open Athlete's Foot stores at 20505 S. Dixie Hwy., RM 1115 - Cutler Ridge Mall Miramar, Florida 33189 and at 1263 NE 163rd Street - #1020, North Miami, Florida 33162 (the "Stores") after refusing service for numerous letters of default and termination of your operating agreements. In addition, you continue to sell athletic footwear at those locations. Upon the termination of your operating agreements with AFB, as successor in interest to the Athlete's Foot Brands Inc., you were obligated to permanently de-identify the Store by removing all, signs, displays, wallpaper, wall murals, fixtures, awnings, and decor associated with AFB's system, including all items bearing, copyrighted characters, the Marks, the Trade Dress, and all other intellectual property of AFB. Your continued use of the Marks and the Athlete's Foot is likely to cause confusion with respect to the connection, licensing, sponsorship, endorsement, or authorization of those products by AFB.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

47.     Plaintiffs again demanded that Defendants cease the use of the Mark, the System, or the Trade Dress, and to generally dissociate themselves with the Athlete's Foot® Marks and brand:

> **AFB demands that you immediately remove the Marks from the Store, cease all other uses of the Marks, and refrain from using the Marks in the future.** Specifically, AFB demands that:
>
> 1. you immediately and permanently remove from the interior and exterior of the Premises all elements of the Marks, including the AFB signs on the front of the Store;
> 2. you immediately and permanently remove from the interior and exterior of the Store all elements of the Trade Dress, including, but not limited to, the menu boards and all other fixtures and decor; and
>
> 3. you provide me with photographic evidence that you have taken the foregoing actions and sign the attached Certification and return it to Luana Frederick by August 1, 2008.
>
> If you fail to timely comply with the foregoing, we will assume that you are not interested in reaching an amicable resolution of this matter. In the absence of your voluntary cooperation, AFB will avail itself of all appropriate remedies under federal law, including seeking injunctive relief, damages, profits, costs and attorneys' fees, and all remedies available under applicable state law and common law.

(emphasis added).

48.     Despite the Termination Notice and the Infringement Notice, Defendants continue to operate both stores and continue using Plaintiffs' valuable Mark and other proprietary information.

49.     Defendants also have failed to comply with their other post-termination obligations under the Agreements, including those in Section 12 of both the 163rd Agreement and the Southland Agreement, which are entitled "Company's Obligations on Termination."[3]

50.     The 163rd Agreement provides, _inter alia_:

> 12.3 Upon the expiration or termination of this Agreement for any reason, Company shall return to AFB the Operations/Training Manual and The Manual of Policies and Standards and all manuals, tapes and other materials which are part of the System and which were provided to Company at any

---

[3] As noted, "Company" refers to the franchisees, Defendants Phase V and Delon Turner.

11

time, together with any and all copies thereof which were made by Company.

12.4 Upon expiration or termination of this Agreement for any reason, Company shall take all actions as may be necessary or required to cancel or transfer to AFB or its designee all rights which Company has in any telephone numbers and all classified and other directory listings for the Store. Company acknowledges that as between AFB and Company, AFB has the sole rights to and interest in all telephone numbers, facsimile numbers and directory listings associated with the Mark, and Company hereby authorizes AFB to direct the telephone company and all listing agencies to transfer same to AFB or its designee, should Company fail or refuse to do so, and to forward all calls to such telephone numbers to THE ATHLETE'S FOOT® toll free locator service. The telephone company and all listing agencies may accept such direction or this Agreement as conclusive evidence of the exclusive rights of AFB in such telephone numbers and directory listings and its authority to direct their transfer.

\*\*\*

12.6 Upon expiration or termination of this Agreement for any reason, Company shall take all actions necessary to cancel all fictitious, trade or business name registrations, all e-mail addresses and all Internet URL addresses or domain names registered by Company (notwithstanding the restriction set forth in Section 7.1 (w) hereof) which include either of the words "Athlete's" or "Foot" and Company hereby authorizes AFB to execute and file on behalf of Company any and all documents which are necessary to cancel such registrations on the public record.

51.    The Southland Agreement contains substantially identical provisions, including Arts. 12.3, 12.4, and 12.6.

52.    Defendants have failed to carry out these obligations, including the return of the materials referenced in Art. 12.3 of the 163rd Agreement and the Southland Agreement.

**Defendants are Legally and Contractually Prohibited From Continuing to Use Plaintiffs' Mark, System, and Trade Dress**

53.    As noted earlier, both the 163rd Agreement and the Southland Agreement required Defendants immediately to cease using Plaintiffs' Mark, System, and Trade Dress and to take all

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

necessary steps to disassociate themselves from those items and from Plaintiffs' brand name generally. Defendants have not followed these contractual obligations.

54.     The 163rd Agreement provides, inter alia:

> 12.1 Upon expiration or termination of this Agreement for any reason, Company shall:
> (a) Discontinue all use of the Mark, all use of the System, all use of any of AFB's copyrights or the distinctive features of the AFB Trade Dress used in connection with the Mark and all use of any goods, bags or supplies bearing the Mark and make disposition of the AFB Trade Dress as prescribed on Exhibit B attached hereto;
> (b) Make or cause to be made such changes in signs, buildings and structures so as to indicate to the public that Company is no longer associated with AFB in any manner and is no longer entitled to use the Mark or the System and shall vacate the premises of the Store promptly and completely;
> (c) Close all of its accounts with vendors of Goods; and
> (d) Cancel all fictitious, tradename or business name registrations of the name THE ATHLETES FOOT® made with any governmental authority or agency.

55.     The Southland Agreement provides, inter alia:

> 12.1 Upon expiration or termination of this Agreement for any reason, Company agrees that it shall:
> (a) Discontinue all use of the Mark, all use of the System, all use of any of AFMA's copyrights or the distinctive features of the AFMA Trade Dress used in connection with the Mark and all use of any goods, bags or supplies bearing the Mark and make disposition of the AFMA Trade Dress as prescribed on Exhibit B attached hereto;
> (b) Make or cause to be made such changes in signs, buildings and structures so "as to indicate to the public that Company is no longer associated with AFMA in any manner and is no longer entitled to use the Mark or the System and shall vacate the premises of the Store promptly and completely;
> (c) Close all of its accounts with vendors of Goods; and
> (d) Cancel all fictitious, tradename or business name registrations of the name THE ATHLETE'S FOOT® made with any governmental authority or agency.

56.     Despite Defendants having breached the 163rd Agreement and the Southland Agreement and despite Plaintiffs' valid termination of these Agreements, Defendants continue to use Plaintiffs' Mark, System and Trade Dress, and to associate themselves with Plaintiffs' brand.

13

57.     This conduct on the part of Defendants is in violation of their post-term obligations under these Agreements, as well as, <u>inter alia</u>, a violation of the Lanham Act.

**<u>Defendants Are Violating the Non-Compete Covenant of the Agreements</u>**

58.     As noted earlier, Defendants agreed, under both the 163rd Agreement and the Southland Agreement, to certain non-compete covenants.   Defendants have violated and are presently violating these covenants.

59.     The 163rd Agreement provides, <u>inter alia</u>:

> 12.2  Upon expiration or termination of this Agreement under the provisions of Section 9.1, 10.1 or 10.2, **neither Company, directly or through any other person or entities directly or indirectly related to Company or Company's members, nor any of Company's members will own, operate or conduct any business that offers for sale athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity), footwear accessory products, athletic apparel or any other products or services which are similar in kind or nature to those offered by Company under this Agreement or are competitive with the products or services being offered by stores operated under the Mark for a period of one (1) year in the Company's Area of Non-Competition;** provided, however, that the area encompassed by a ten (10) mile radius around any other stores operating under the Mark on the date hereof which are closed between the date hereof and the date of such expiration or termination of this Agreement shall be automatically excluded from Company's Area of Non-Competition. In the event Company fails to honor its obligation not to compete with AFB as set forth above, the term of Company's non-competition obligation shall be extended for a period of time equal to the period of time during which Company fails to comply with the provisions of this Section 12; it being the intent of the parties that AFB shall be entitled to a period of one (1) full year during which Company shall not compete with AFB as provided herein.

(emphasis added).  The "Area of Non-Competition" was defined in Art. 1.1(f) as "Company's Area of Responsibility or the area within a ten (10) mile radius around the premises of the Store, whichever is greater; and (ii) the area within a ten (10) mile radius around all other stores operating under the Mark in the United States of America on the date hereof."

60.     The Southland Agreement provides, <u>inter alia</u>:

14

12.2 Company and each of its members agree that, upon expiration or termination of this Agreement under the provisions of Section 9.1, 10.1 or 10.2, **neither Company, directly or through any other entity directly or indirectly related to Company or Company's members, nor any of Company's members will conduct any business or operate any stores involving the sale of athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity), footwear accessory products, athletic apparel or any other products or services which are competitive with the products or services being offered by stores operated under the Mark for a period of one (1) year in the Company's Area of NonCompetition**; provided, however, that the area encompassed by a ten (10) mile radius around any other stores operating under the Mark on the date hereof which are closed between the date hereof and the date of the expiration or termination of this Agreement shall be automatically excluded from Company's Area of Non-Competition. In the event Company fails to honor its obligation not to compete with AFMA as set forth above, the term of Company's noncompetition obligation shall be extended for a period of time equal to the period of time during which Company fails to comply with the provisions of this Section 12; it being the intent of the parties that AFMA shall be entitled to a period of one (1) full year during which Company shall not compete with AFMA as provided herein.

(emphasis added). The "Area of Non-Competition" was defined in Art. 1.1(e) as "Company's Area of Responsibility or the area within a ten (10) mile radius around the premises of the Store, whichever is greater; and (ii) the area within a ten (10) mile radius around all other stores operating under the Mark on the date upon which this Agreement expires or is terminated."

61. Defendants' continued operation of the 163rd Store and the Southland Store, which includes the sale of athletic footwear, "brown shoes," footwear accessory products and athletic apparel, is in direct violation of the express terms of the non-compete covenants in the 163rd Agreement and Southland Agreement.

**<u>Irreparable Harm and Other Damage</u>**

62. Unless Defendants are enjoined from using the Mark, System, and Trade Dress, and Plaintiffs' brand name generally, and from continuing to breach their non-compete covenants, and misusing Plaintiffs' proprietary and confidential information and unfairly competing with Plaintiffs

15

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

and its franchisees, Plaintiffs and its franchisees are being and will continue to be irreparably harmed in the nature of:

a.      Confusion of customers who intend to do business with a legitimate Athlete's Foot franchisee;

b.      Damage to customer goodwill and the confidence and trust customers repose in Athlete's Foot and its franchisees;

c.      Disturbance of Athlete's Foot and its franchisees' relationships with customers;

d.      Damage to Athlete's Foot business reputation;

e.      Loss of confidence of Athlete's Foot remaining franchisees who rely on Athlete's Foot to enforce non-competition agreements; and

f.      Damage to the continued viability of Athlete's Foot franchise system.

63.      Irreparable harm to Plaintiffs also is resulting from Defendants' breach of their non-compete covenant because Defendants' continued operation of their former franchises interferes with Plaintiffs' ability to establish a new, legitimate franchisee in that market area.

64.      A prospective franchisee would be reluctant to agree to operate a franchise within Defendants' Area of Non-Competition while Defendants operate an unauthorized franchise within the same area.

65.      Defendants' continued flouting of the non-compete covenants could also lead to other franchisees or former franchisees of Plaintiffs to engage in similar conduct, either by continuing to operate a franchise after the franchise agreement is terminated or by engaging in the sale of products that are competitive to Plaintiffs' products. Such conduct would constitute irreparable loss of customer goodwill associated with the Mark, the System, and Trade Dress. Moreover, a successful franchise system is dependent on receiving proper royalty payments, and

16

having franchisees or former franchisees sell goods in a manner that would lead to no or decreased royalty payments jeopardizes the franchise system.

## COUNT I -- TRADEMARK AND SERVICE MARK INFRINGEMENT
### UNDER SECTION 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

66. Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

67. Defendants currently are using the Mark even though their license to do so has been terminated and Plaintiffs no longer consent to Defendants' use of the Mark.

68. Defendants' conduct is in willful violation of their contractual obligations to Plaintiffs and of the Lanham Act.

69. Defendants' use of the Mark in connection with the operation of their former franchises likely will cause confusion or mistake in the minds of the public and cause purchasers to believe that the goods and services being offered or intended to be offered were the goods and services of Athlete's Foot, and thus constitute an infringement of Athlete's Foot trademark and service mark rights.

70. Defendants' infringement was and is a willful attempt to deceive the public, trade upon the goodwill of Athlete's Foot and cause irreparable harm to Athlete's Foot.

71. The conduct of Defendants constitutes fraud and deceit upon the consuming public in the United States.

72. Defendants' conduct has resulted and will continue to result in the loss of Athlete's Foot's goodwill and have caused and will continue to cause Athlete's Foot irreparable injury.

73. Athlete's Foot has no adequate remedy at law.

## COUNT II -- UNFAIR COMPETITION
### UNDER SECTION 43(A) OF THE LANHAM ACT (15 U.S.C. § 1125(A))

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

74.     Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

75.     Defendants currently are selling athletic footwear, "brown shoes," footwear accessory products or athletic apparel similar to the athletic footwear, "brown shoes," footwear accessory products and athletic apparel sold by Athlete's Foot and its franchisees.

76.     Defendants are misusing THE ATHLETE'S FOOT® per se and THE ATHLETE'S FOOT® design service marks.

77.     Defendants are operating stores in a manner identical or closely related to the manner under which stores are run under the Athlete's Foot's System and Trade Dress, including by using and displaying numerous elements of Athlete's Foot's Trade Dress.

78.     The interior and exterior appearances of Defendants' stores, for all intents and purposes, is identical or closely related to the interior and exterior appearances of other legitimate Athlete's Foot franchises.

79.     Defendants' continued use of Athlete's Foot's Mark, System, Trade Dress and signage likely will cause mistake or confusion in the marketplace in the minds of purchasers and lead them to believe that Defendants' products and services are those of Athlete's Foot or one of its authorized franchisees.

80.     Use by Defendants of Athlete's Foot's Mark, System, Trade Dress and signage for its services and goods constitutes unfair competition under the Lanham Act.

81.     Defendants are deliberately attempting to trade upon the goodwill of Athlete's Foot by selling and advertising its goods and services as the goods and services of Athlete's Foot.

82.     Defendants' conduct constitutes a fraud and deceit upon the consuming public in the United States.

18

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

83.     The conduct has resulted and will continue to result in the loss of Athlete's Foot's goodwill and have caused and will continue to cause Athlete's Foot irreparable injury.

84.     Athlete's Foot has no adequate remedy at law.

## COUNT III – UNFAIR COMPETITION UNDER STATE LAW

85.     Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 and 75 through 79 of the Complaint.

86.     By engaging in the conduct described above, including but not limited to their unlawful use of Athlete's Foot's Mark, System, Trade Dress and signage, violating the non-compete covenants of the 163rd Agreement and the Southland Agreement, and misappropriating Athlete's Foot's proprietary and confidential information, Defendants have engaged in unfair competition with Athlete's Foot.

87.     The conduct of Defendants is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to Plaintiffs.

88.     Plaintiffs have no adequate remedy at law.

## COUNT IV -- BREACH OF THE 163rd AGREEMENT-- VIOLATION OF THE NON-COMPETE COVENANTS

89.     Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

90.     Defendants Phase V and Delon Turner have violated and are continuing to violate the non-compete covenants in the 163rd Agreement by operating and selling athletic footwear, "brown shoes," footwear accessory products or athletic apparel in the 163rd Store.

91.     This store is within Defendants' "Area of Non-Competition," as defined in the 163rd Agreement, as it is at the same location where Defendants formerly operated a franchise pursuant to the 163rd Agreement.

19

92.     The conduct of Defendants is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to Plaintiffs.

93.     Plaintiffs have no adequate remedy at law.

**COUNT V -- BREACH OF THE SOUTHLAND AGREEMENT--**
**VIOLATION OF THE NON-COMPETE COVENANTS**

94.     Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

95.     Defendants Phase IV, Delon Turner, Tonya Baker-Turner, and Sabrina Baker-Bouie have violated and are continuing to violate the non-compete covenants in the Southland Agreement by operating and selling athletic footwear, "brown shoes," footwear accessory products or athletic apparel in the Southland Store.

96.     This store is within Defendants' "Area of Non-Competition," as defined in the Southland Agreement, as it is at the same location where Defendants formerly operated a franchise pursuant to the Southland Agreement.

97.     The conduct of Defendants is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to Plaintiffs.

98.     Plaintiffs have no adequate remedy at law.

**COUNT VI -- BREACH OF 163rd AGREEMENT --**
**NONPAYMENT OF ROYALTIES AND OTHER CHARGES**

99.     Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

100.     Defendants Phase V and Delon Turner owe Plaintiffs royalty and other fees based upon their unauthorized use of the Mark, System and Trade Dress.

20

101.    Pursuant to Section 3.6 of the 163rd Agreement, the overdue amounts bear interest at the rate of one and one-half percent (1.5%) per month, or the highest rate of interest permitted by law, whichever is less. Interest will continue to accrue on the amount owed until Plaintiffs receive full payment from Defendants.

102.    Section 3.6 of the 163rd Agreement also provides that in the event that Plaintiffs are required to commence and prosecute formal legal proceedings for the collection of royalty fees, Defendants agree to reimburse any and all reasonable attorneys' fees, filing fees and other costs.

103.    Pursuant to Section 13 of the 163rd Agreement, Plaintiffs were granted a security interest in all of the personal property used in connection with the 163rd Store ("Collateral") as security for the payment of royalty fees.

104.    To the extent that the Collateral is not attached to real estate, Plaintiffs demand that the Collateral be assembled and turned over to Athlete's Foot for liquidation as a secured party under the Uniform Commercial Code or other applicable law.

### COUNT VIII -- BREACH OF SOUTHLAND AGREEMENT -- NONPAYMENT OF ROYALTIES AND OTHER CHARGES

105.    Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

106.    Defendants Phase IV, Delon Turner, Tonya Baker-Turner, and Sabrina Baker-Bouie owe Plaintiffs royalty and other fees based upon their unauthorized use of the Mark, System and Trade Dress.

107.    Pursuant to Section 3.6 of the Southland Agreement, the overdue amounts bear interest at the rate of one and one-half percent (1.5%) per month, or the highest rate of interest permitted by law, whichever is less. Interest will continue to accrue on the amount owed until Plaintiffs receive full payment from Defendants.

21

108.     Section 3.6 of the Southland Agreement also provides that in the event that Plaintiffs are required to commence and prosecute formal legal proceedings for the collection of royalty fees, Defendants agree to reimburse any and all reasonable attorneys' fees, filing fees and other costs.

109.     Pursuant to Section 13 of the Southland Agreement, Plaintiffs were granted a security interest in all of the personal property used in connection with the Southland Store ("Collateral") as security for the payment of royalty fees.

110.     To the extent that the Collateral is not affixed to real estate, Plaintiffs demand that the Collateral be assembled and turned over to Athlete's Foot for liquidation as a secured party under the Uniform Commercial Code or other applicable law.

**COUNT IX -- BREACH OF 163rd AGREEMENT --**
**FAILURE TO CEASE USE OF THE MARK, SYSTEM, AND TRADE DRESS**

111.     Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 and 75 through 79 of the Complaint.

112.     Defendants' conduct, including its continued use of the Athlete's Foot® Mark, System, Trade Dress, and brands, are in breach of its contractual obligations under the 163rd Agreement to use them only in connection with the operation of the 163rd Store, and to refrain from using them upon termination of the 163rd Agreement.

113.     As a result of Defendants' conduct, Athlete's Foot and its franchisees have been and will continue to be injured through infringement, misuse, diminution and dilution of the goodwill and consumer recognition associated with Athlete's Foot.

**COUNT X -- BREACH OF SOUTHLAND AGREEMENT --**
**FAILURE TO CEASE USE OF THE MARK, SYSTEM, AND TRADE DRESS**

114.     Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 and 75 through 79 of the Complaint.

22

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

115.   Defendants' conduct, including its continued use of the Athlete's Foot® Mark, System, Trade Dress, and brands, are in breach of its contractual obligations under the Southland Agreement to use them only in connection with the operation of the Southland Store, and to refrain from using them upon termination of the Southland Agreement.

116.   As a result of Defendants' conduct, Athlete's Foot and its franchisees have been and will continue to be injured through infringement, misuse, diminution and dilution of the goodwill and consumer recognition associated with Athlete's Foot.

## COUNT XI -- ACCOUNTING

117.   Athlete's Foot incorporates by reference each of the allegations contained in paragraphs 1 through 65 of the Complaint.

118.   Pursuant to the provisions of the 163rd Agreement and the Southland Agreement, and by virtue of their inequitable conduct, Defendants are obligated to provide Athlete's Foot with an accounting of the gross receipts and revenue derived from their operation of the 163rd Store and the Southland Store, from the date since Defendants have failed to provide the required reporting under the 163rd Agreement and Southland Agreement to the date Defendants cease to operate the 163rd Store and the Southland Store.

119.   This accounting is necessary to determine the amount of continuing franchise, marketing, and any and all fees due to Athlete's Foot, and to determine the extent of the unjust enrichment derived by Defendants from their unauthorized use, infringement, misuse and misappropriation of the Athlete's Foot® Mark, System, Trade Dress, and brands.

120.   The 163rd Agreement and Southland Agreement between Defendants and Athlete's Foot involve extensive and complicated accounts.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

121.   The amount of revenues received by Defendants at the 163rd Store and the Southland Store is peculiarly within Defendants' knowledge, and Athlete's Foot requires an accounting to determine the amount of such revenues.

122.   Athlete's Foot has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants with respect to all Counts of the Complaint as follows:

1.   That Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them be preliminarily and thereafter permanently enjoined from using Athlete's Foot's Mark, Trade Dress and System, or any elements thereof, in connection with the operation of any store that sells athletic footwear, "brown shoes," footwear accessory products or athletic apparel, including but not limited to the retail athletic footwear store currently being operated at the 163rd Store and the Southland Store.

2.   That Defendants be required to make such changes in buildings and structures and other trade dress, so as to indicate to the public that it is no longer associated with Athlete's Foot in any manner and is no longer entitled to use the Mark, System or the Trade Dress, including but not limited to the 163rd Store and the Southland Store.

3.   That Defendants be required to comply with all outstanding obligations under the Southland Agreement and the 163rd Agreement, including but not limited to returning all proprietary materials and information to Athlete's Foot.

4.   That Defendants be preliminarily and thereafter permanently enjoined for a period of one (1) year from the date of entry of such injunction from conducting any business or operating any stores that involve the sale of athletic footwear, "brown shoes," footwear accessory products,

24

athletic apparel or any other products or services that are competitive with the products or services being offered by stores operated under the Mark in the Area of Non-Competition, as that term is defined in the 163rd Agreement.

5.    That Defendants be preliminarily and thereafter permanently enjoined for a period of one (1) year from the date of entry of such injunction from conducting any business or operating any stores that involve the sale of athletic footwear, "brown shoes," footwear accessory products, athletic apparel or any other products or services that are competitive with the products or services being offered by stores operated under the Mark in the Area of Non-Competition, as that term is defined in the Southland Agreement.

6.    That Defendants be preliminarily and thereafter permanently enjoined from effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the directives of the injunction.

7.    That Defendants be required to make a verified report to the Court within thirty (30) days setting forth all actions taken by the Defendants to comply with the injunction and the dates such actions were taken.

8.    That Defendants be required to provide an accounting of all sales, revenues and fees received by it for products distributed, marketed or sold by them (and the receipts, gross profits and expenses relating thereto) using Athlete's Foot's Mark, System or Trade Dress after June 11, 2008.

9.    That Plaintiffs be awarded damages in the amount of the past due royalties and any other owed fees and all of Defendants' profits, gains or advantages of any kind resulting from Defendants' unfair competition, as well interest on said amounts and attorneys' fees.

10.    As to any and all Collateral not affixed to real estate, that Defendants be directed and ordered to assemble and turn over said Collateral to Plaintiffs for liquidation by Plaintiffs as

secured parties under the Uniform Commercial Code or other applicable law with the proceeds to be applied towards satisfaction of the amount due and owing Plaintiffs under the 163rd Agreement and the Southland Agreement.

11.     That all damages be trebled as appropriate.

12.     That Plaintiffs be awarded punitive damages based upon Defendants' tortious conduct as set forth above.

13.     That Defendants be directed to pay all of Plaintiffs' costs connected with this action, including reasonable attorneys' fees, as authorized by the 163rd Agreement and the Southland Agreement, and any other source or law.

14.     That Plaintiffs be given such other and further relief as the Court may deem just and proper.

Dated:  September 17, 2008

Respectfully submitted,

ASTIGARRAGA DAVIS MULLINS
     & GROSSMAN, P.A.
*Attorneys for Plaintiffs Athlete's Foot Brands, LLC,*
*and NexCen Brands, Inc.*
701 Brickell Avenue
16th Floor
Miami, Florida 33131
Tel:  (305) 372-8282
Fax:  (305) 372-8202

By: _____
Edward M. Mullins
Florida Bar No. 863920
Douglas J. Giuliano
Florida Bar No. 15282

26

## VERIFICATION

I, Kevin Cox, of full age, being duly sworn according to law, upon oath, depose and say:

1. I am Director of Retail Operations – Americas for NexCen Franchise Management, Inc. NexCen Franchise Management, Inc., is a wholly owned subsidiary of NexCen Brands, Inc., and provides management services to Athlete's Foot Brands, LLC.

2. I have read the foregoing Complaint and all the allegations contained therein. All the allegations in the Complaint are true based on my personal knowledge and the business records of Athlete's Foot.

UNDER PENALTIES OF PERJURY PURSUANT TO 28 U.S.C. § 1746 AND SECTION 92.525 OF THE FLORIDA STATUTES, I DECLARE THAT I HAVE READ THE FOREGOING AND THAT THE FACTS STATED HEREIN ARE TRUE.

Dated this 17th day of September, 2008

_____
KEVIN COX

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

ATHLETE'S FOOT BRANDS, LLC, et al. v.
TURNER PHASE IV, LLC, et al.
CASE NO.

EXHIBIT A

## EXHIBIT A

### MARK



ATHLETE'S FOOT BRANDS, LLC, et al. v.
TURNER PHASE IV, LLC, et al.
CASE NO.

EXHIBIT B

·United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout | Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 035. US 100 101 102. G & S: providing business information by means of a computer network web site. FIRST USE: 19951108. FIRST USE IN COMMERCE: 19951108 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.11.08 - Feet, human; Foot prints, human; Human feet, toes, imprints of feet or toes, legs; Imprints, feet or toes 03.17.01 - Wings, birds' |
| **Serial Number** | 75506670 |
| **Filing Date** | June 22, 1998 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 26, 1999 |
| **Registration Number** | 2308686 |
| **Registration Date** | January 18, 2000 |
| **Owner** | (REGISTRANT) Athlete's Foot Marketing Associates, Inc. CORPORATION DELAWARE 1412 Oakbrook Drive Suite 100 Norcross GEORGIA 30093

(LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | STEPHEN M. DORVEE |
| **Prior Registrations** | 1094685;1631686;1631948;1632670;1634135;1697105;1712473;1781509;1821855; 1953326 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |

**Live/Dead Indicator**       LIVE

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout | Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 025. US 022 039. G & S: athletic footwear. FIRST USE: 19940818. FIRST USE IN COMMERCE: 19940818 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74592031 |
| **Filing Date** | October 28, 1994 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | July 11, 1995 |
| **Registration Number** | 2209347 |
| **Registration Date** | December 8, 1998 |
| **Owner** | (REGISTRANT) Athlete's Foot Marketing Associates, Inc. CORPORATION DELAWARE 1950 Vaughn Road Kennesaw GEORGIA 30144 |
| | (LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Stephen M. Dorvee, |
| **Prior Registrations** | 0997607;1004286;1094685;1631686;1631948;1632670;1634135;1697105;1712473; AND OTHERS |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

**Logout**   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 025. US 039. G & S: ATHLETIC WEAR SUCH AS T-SHIRTS, WARM-UP SUITS, TENNIS SUITS, RUNNING AND JOGGING SUITS, SOCKS, HEADWEAR, WRIST BANDS, JERSEYS AND SHIRTS SOLD THROUGH STORES SPECIALIZING IN THE SALE OF ATHLETIC SHOES AND CLOTHING. FIRST USE: 19710500. FIRST USE IN COMMERCE: 19710500 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73282193 |
| **Filing Date** | October 17, 1980 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | November 13, 1990 |
| **Registration Number** | **1634135** |
| **Registration Date** | February 5, 1991 |
| **Owner** | (REGISTRANT) Athlete's Foot Marketing Associates, Inc. CORPORATION PENNSYLVANIA 3735 ATLANTA INDUSTRIAL PARKWAY ATLANTA GEORGIA 30331

(LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | SCOTT E. TAYLOR |
| **Prior Registrations** | 0997607;1004286;1094685 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010515. |
| **Renewal** | 1ST RENEWAL 20010515 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | Top | HELP |

**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | Browse Dict | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | ( *Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 042. US 101. G & S: RETAIL ATHLETIC CLOTHING AND FOOTWEAR STORE SERVICES. FIRST USE: 19720726. FIRST USE IN COMMERCE: 19720726 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.11.08 - Feet, human; Foot prints, human; Human feet, toes, imprints of feet or toes, legs; Imprints, feet or toes<br>03.17.01 - Wings, birds' |
| **Serial Number** | 73816593 |
| **Filing Date** | August 1, 1989 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 30, 1990 |
| **Registration Number** | **1632670** |
| **Registration Date** | January 22, 1991 |
| **Owner** | (REGISTRANT) ATHLETE'S FOOT MARKETING ASSOCIATES, INC. CORPORATION DELAWARE 1412 Oakbrook Drive Suite 100 Norcross GEORGIA 30093<br><br>(LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | SCOTT E. TAYLOR, ESQ. |
| **Prior Registrations** | 0997607;1004286;1094685 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010502. |
| **Renewal** | 1ST RENEWAL 20010502 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | Browse Dict | SEARCH OG | TOP | HELP |

**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 042. US 101. G & S: RETAIL ATHLETIC CLOTHING AND FOOTWEAR STORE SERVICES. FIRST USE: 19720726. FIRST USE IN COMMERCE: 19720726 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73813640 |
| **Filing Date** | July 20, 1989 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 23, 1990 |
| **Registration Number** | 1631948 |
| **Registration Date** | January 15, 1991 |
| **Owner** | (REGISTRANT) ATHLETE'S FOOT MARKETING ASSOCIATES, INC. CORPORATION DELAWARE 1412 Oakbrook Drive Suite 100 Norcross GEORGIA 30093

(LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | SCOTT E. TAYLOR, ESQ. |
| **Prior Registrations** | 0997607;1004286;1094685 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010502. |
| **Renewal** | 1ST RENEWAL 20010502 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

United States Patent and Trademark Office

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

TESS HOME  NEW USER  STRUCTURED  FREE FORM  BROWSE DICT  SEARCH OG  BOTTOM  HELP

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

TARR Status  ASSIGN Status  TDR  TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 025. US 039. G & S: t-shirts, warm-up suits, tennis suits, running or jogging suits, socks, headwear, wrist bands, athletic jerseys, golf shirts, running shorts and running singlets. FIRST USE: 19710500. FIRST USE IN COMMERCE: 19710500 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.11.08 - Feet, human; Foot prints, human; Human feet, toes, imprints of feet or toes, legs; Imprints, feet or toes 03.17.01 - Wings, birds' |
| **Serial Number** | 74028604 |
| **Filing Date** | February 13, 1990 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 23, 1990 |
| **Registration Number** | 1631686 |
| **Registration Date** | January 15, 1991 |
| **Owner** | (REGISTRANT) Athlete's Foot Marketing Associates, Inc. CORPORATION DELAWARE 1412 Oakbrook Drive Suite 100 Norcross GEORGIA 30093

(LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LTD LIAB CO DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | SCOTT E. TAYLOR, ESQ. |
| **Prior Registrations** | 0997607;1004286;1094685 |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010502. |

**Renewal**   1ST RENEWAL 20010502

**Live/Dead**
**Indicator**   LIVE

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP

United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sat Sep 13 04:10:58 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

[ Logout ] Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)* |

## Typed Drawing

| | |
|---|---|
| **Word Mark** | THE ATHLETE'S FOOT |
| **Goods and Services** | IC 035. US 101. G & S: RENDERING ASSISTANCE IN CONNECTION WITH THE ESTABLISHMENT AND/OR OPERATION OF RETAIL STORES FOR SELLING ATHLETIC SHOES, AND ATHLETIC CLOTHING, WHICH STORES DO BUSINESS UNDER THE PROMINENTLY DISPLAYED TERM "THE ATHLETE'S FOOT". FIRST USE: 19720726. FIRST USE IN COMMERCE: 19720726 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73015491 |
| **Filing Date** | March 11, 1974 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Registration Number** | **1094685** |
| **Registration Date** | June 27, 1978 |
| **Owner** | (REGISTRANT) ATHLETE'S FOOT MARKETING ASSOCIATES, INC., THE CORPORATION PENNSYLVANIA 813 LIBERTY AVE. PITTSBURGH PENNSYLVANIA 15222 |
| | (LAST LISTED OWNER) ATHLETE'S FOOT BRANDS, LLC LIMITED LIABILITY COMPANY DELAWARE 1950 VAUGHN ROAD KENNESAW GEORGIA 301447017 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Lisa W. Rosaya |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20080818. |
| **Renewal** | 2ND RENEWAL 20080818 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

ATHLETE'S FOOT BRANDS, LLC, et al. v.
TURNER PHASE IV, LLC, et al.
CASE NO.

EXHIBIT C

## EXHIBIT B

## AFMA TRADE DRESS

The following items are considered a part of the trade dress of a The Athlete's Foot® store. All usage of such item must cease immediately upon termination or expiration of the Operating Agreement. All of such items must be disposed of from the premises as set forth below when disassociation takes place.

- Exterior Sign

- Fit Print System (Scanner)

- Inventory Control System

- Cash Wrap purchased from AFMA

- If applicable, AFMA special order AFMA carpet

- Installed flooring

- All interior signage provided by or purchased through AFMA regardless if it contains the logo

- All AFMA merchandise bags

- All seating purchased from AFMA

- Wall display systems purchased through AFMA (grid with lighted acrylic)

- All merchandise towers purchased from AFMA or other display fixtures

- All private label product whether footwear, clothing, or accessories purchased through the AFMA programs or from AFMA

- All uniforms containing the AFMA logo

- The grid wall displays purchased through AFMA

- Any wallpaper or wall covering purchased through AFMA

- All point of purchase materials

- All category and gender signage

- All sale tags and other tags ("clearance, etc.") purchased from or provided from AFMA

- Other display fixtures including rolling bins

- Telephone listings as The Athlete's Foot® must be changed

All binders, manuals, and other publications must be sent back to AFMA at its office in Kennesaw, GA.

All items of furniture, fixtures, equipment and supplies must be: (a) destroyed; (b) returned to AFMA at no cost to AFMA; or (c) sold to another approved franchisee of AFMA.

ATHLETE'S FOOT BRANDS, LLC, et al. v.
TURNER PHASE IV, LLC, et al.
CASE NO.

EXHIBIT D

**Corporate Store Sale Program**
**163rd Street Mall**

**OPERATING AGREEMENT**

MADE this _1st_ day of _December_, 2005, effective as of March 28, 2005, by and among **ATHLETE'S FOOT BRANDS, INC.**, a Delaware corporation ("AFB"), **ATHLETE'S FOOT MARKETING ASSOCIATES, LLC**, a Delaware limited liability company (hereinafter referred to as "AFMA") and **TURNER PHASE V, LLC** Florida corporation limited liability company (hereinafter referred to as "Company"). (AFMA and AFB are hereinafter sometimes referred to together as the "Franchising Entities.")

WHEREAS, AFB owns and uses the trademark and service mark THE ATHLETE'S FOOT® per se and in the form shown on Exhibit A attached hereto; and

WHEREAS, AFB owns and uses a distinctive business format and has assembled several items of equipment designed specifically for use in the operation of specialty retail athletic footwear stores under the Mark (as hereinafter defined); and

WHEREAS, Company desires to obtain the rights to use the Mark and to enjoy the benefits of the System (as hereinafter defined) and AFB is willing to grant such rights on the terms and conditions hereinafter provided; and

WHEREAS, AFB and AFMA are parties to a Management Agreement dated August 1, 2003 (the "Management Agreement") pursuant to which AFB has engaged AFMA to provide all of the management and administrative services required in order to permit Company to enjoy the benefits of the System in accordance with the terms of this Agreement; and

WHEREAS, AFB and AFMA offered a special one time franchise program in connection with the liquidation of the specialty retail athletic footwear stores owned by The Athlete Foot Stores, LLC ("TAFS") through a Chapter 11 liquidation proceeding under the United States Bankruptcy Code under which only persons who purchased one or more of such stores from TAFS were eligible to participate ("Corporate Store Sale Program"); and

WHEREAS, Company desires to participate in the Corporate Store Sale Program and has purchased a store in the Chapter 11 liquidation proceeding of TAFS.

NOW, THEREFORE, in consideration of the mutual covenants and obligations herein contained, and intending to be legally bound, the parties hereto agree as follows:

1.    Definitions

1.1    As used herein, the following terms shall have the following meanings:

(a)    "AFB Trade Dress" shall mean the combination of the distinctive and identifying interior and exterior store layout, signage, design and decor features used by AFB as part of the uniform appearance of all stores operating under the Mark, including, without limitation, the items of decor, fixtures and accessories described on Exhibit B attached hereto, as the same may be modified from time to time by AFB and implemented by AFMA.

(b)    "Affiliate" shall mean an entity controlling, controlled by or under common control with another person or entity, as applicable.

(c)     "Annual Capital Expenditure Amount" shall have the meaning given it in Section 7.1(q)(i).

(d)     "Approved Goods" shall mean those items of athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity) and merchandise related to athletics and physical and mental well-being and the manufacturers and/or suppliers thereof which:

(i)     have been approved by the Goods Selection Committee of AFMA for sale in the Store as identified on a list of such goods published by AFMA, as said list may be amended from time to time by AFMA including, without limitation, Private Label Goods; and

(ii)    Company is eligible to carry in the Store based upon compliance with eligibility criteria set forth in the Manual of Policies and Standards.

(e)     "Confidential Information" shall mean all information, data, documents, records and other materials, written, oral or electronic, relating to the business of either of the Franchising Entities and the conduct of business under the Mark which is non-public and the property of the Franchising Entities or any of their Affiliates including, without limitation, trade secrets concerning the business and affairs of the Franchising Entities or their Affiliates, the Operations/Training Manuals, the Manual of Policies and Standards, the forms, systems and procedures for the conduct of business under the Mark, know-how, product specifications, past, current and planned research and development, price lists, pricing policies, market studies, systems, store designs, vendor lists.

(f)     "Company's Area of Non-Competition" shall mean: (i) Company's Area of Responsibility or the area within a ten (10) mile radius around the premises of the Store, whichever is greater; and (ii) the area within a ten (10) mile radius around all other stores operating under the Mark in the United States of America on the date hereof.

(g)     "Company's Area of Responsibility" shall mean the premises of 163rd Mall, 1263 NE 163rd Street, Miami, Florida 33162.  Notwithstanding the foregoing, the premises of theme parks, amusement parks, airports and sports arenas otherwise located in Company's Area of Responsibility shall be excluded from Company's Area of Responsibility.

(h)     "Executive" shall mean the individual designated by Company to AFMA as having responsibility for the overall decision-making and strategy for the business to be operated pursuant to this Agreement and who may also be the Manager.

(i)     "Goods" shall mean all items of merchandise offered for sale or sold by or through the Store or by any of Company's representatives.

(j)     "Goods Selection Committee" shall mean those persons employed as members of the franchise operations division of AFMA who are from time to time appointed by AFMA to serve as members of the Committee.

(k)     "Inventory Control System" shall mean the system of computer hardware and software used for tracking purchase orders and receipts, for updating inventory, for generating sales reports, for inventory management and for the analysis of financial information relating to the operation of the Store which is to be used in the Store.

(l)     Intentionally deleted.

- 2 -

(m)     "Manager(s)" shall mean the individual(s) designated by Company to AFMA as having responsibility for the day-to-day management and operation of the Store.

(n)     "Manual of Policies and Standards" shall mean the manual prepared by AFB containing its policies and standards governing relationships between stores operated under the Mark and customers, employees and other stores operated under the Mark, as the same may be modified, revised or updated from time to time by AFB and implemented by AFMA.

(o)     "Mark" shall mean the trademark and service mark THE ATHLETE'S FOOT® per se and in the form shown on Exhibit A attached hereto as well as all other trademarks, service marks, logos, emblems and other designs of AFB, as may be adopted by and authorized for use in writing by AFB from time to time during the term of this Agreement.

(p)     "Marketing Support Fund" shall have the meaning given it in Section 6.2(a).

(q)     "Net Sales" shall mean the sales price of all Goods sold by Company (including the face amount of all gift cards which are to be included at the time of redemption and the full sales price of all layaways, which is to be included at the time of the first payment), whether for cash (including checks) or on credit, whether collected or not, and whether made by Store personnel or by vending machines, deducting therefrom the following:

(i)     the sales price of all Goods purchased at the Store which are returned to the Store by customers and accepted for full credit, or the amount of discounts and allowances made thereon if less than full credit is given;

(ii)     (A) the resale price of all Goods previously purchased from stores operated by other franchisees of AFB which are returned by customers to the Store under the store exchange program of AFB and which have been accepted by Company for full credit;

(B)     the amount of the reimbursement or credit received by Company from the franchisee of AFB which made the original sale for Goods previously purchased from stores operated by other franchisees of AFB which are returned to the Store under the store exchange program of AFB and which have been accepted by Company for full credit thereunder; and

(iii)     sums and credits received in the settlement of claims for loss of or damage to Goods.

(r)     "Operations/Training Manuals" shall mean the manuals prepared by AFB containing instructive materials regarding the methods of operation for stores operated under the Mark and instruction in such methods of operation, as the same may be modified, revised or updated from time to time by AFB and implemented by AFMA

(s)     "Private Label Goods" shall mean any line or lines of private label athletic footwear and footwear accessory products and athletic apparel developed by AFB and branded with any trademark selected by AFB.

(t)     "Private Label Goods Program" shall mean the program established by AFB whereby franchisees of AFB are offered the opportunity to purchase Private Label Goods from AFB or third-party suppliers designated by AFB.

(u)     "Right of First Refusal Period" shall have the meaning given it in Section 11.2.

(v)     "Shareholder Guaranty" shall mean the Shareholder Guaranty in the form attached to this Agreement as an additional signature page.

(w)     "Store" shall mean the business establishment or other location opened and operated by Company as a specialty retail athletic footwear store under the Mark in Company's Area of Responsibility pursuant to the terms of this Agreement.

(x)     "Store Opening Date" shall mean March 28, 2005.

(y)     "Store Operating Information" shall have the meaning given it in Section 7.1(II).

(z)     "System" shall mean the license of the Mark and access to the distinctive business format, Confidential Information and AFB Trade Dress for the operation of specialty retail athletic footwear stores specializing in the sale of athletic footwear and footwear accessory products, including, without limitation, assistance in establishing accounts with vendors of footwear and footwear accessory products, which has been developed by AFB and AFMA for use by persons or entities approved by AFB, as the same may be changed, improved, modified or further developed from time to time.

(aa)    "UCC" shall mean the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

2.      <u>Grant of Rights</u>

2.1     On the terms and subject to the conditions set forth in this Agreement and in consideration of the fees to be paid by Company hereunder:

(a)     AFB hereby grants to Company a license to use the Mark in Company's Area of Responsibility solely to identify one (1) specialty retail athletic footwear store, the merchandise sold through such retail store and the business conducted through such retail store;

(b)     AFB hereby grants to Company the right to use and enjoy the benefits of the System solely in connection with the operation of the business conducted through such retail store; and

(c)     AFB hereby grants to Company the right to open and operate one (1) Store identified by the Mark and using the System.

2.2     Company hereby accepts the foregoing grant of the license of the Mark, the right to use and enjoy the benefits of the System, and the right to open and operate one (1) Store identified by the Mark and using the System, all upon the terms and conditions set forth herein. Company acknowledges and agrees that all of such rights are conditioned upon compliance by Company with the terms and conditions of this Agreement.

2.3     Intentionally deleted.

3.    Fees; Reports; Payment

3.1    (a)    For the Store to be opened and operated by Company, Company shall pay the following to AFB:

(i)    no initial fee shall be due and payable by Company to AFB for the Store to be opened and operated by Company under this Agreement;

(ii)    (1)  a royalty fee for the use of the Mark and the System in an amount equal to three percent (3%) of the Net Sales of Company recorded through the cash register at the Store during the term of this Agreement.  The royalty fee shall be paid on a monthly basis and shall be due and payable within ten (10) calendar days after the close of each calendar month during the term of this Agreement; provided, however, that no royalty fee shall be due and payable by Company in respect of the period of ninety (90) days immediately following the Store Opening Date (the "Royalty Fee Moratorium Period"). If the Royalty Fee Moratorium Period ends on any day but the last day of a calendar month, then Company shall pay to AFB the pro rata portion of the royalty fee due for the remainder of the month in which the Royalty Fee Moratorium Period ends within ten (10) calendar days after the close of such month; and

(2) a royalty fee for the use of the Mark and the System in an amount equal to ten percent (10%) of the Net Sales of Company through off-Store premises sales of Goods made without the prior authorization of AFMA as provided in Section 7.1(bb)(ii) hereof; and

(b)    For the Store, Company shall pay to AFMA a contribution to the Marketing Support Fund in an amount equal to a percentage of the Net Sales of Company during the term of this Agreement, as shall be established annually by AFMA, which shall be paid on a monthly basis and shall be due and payable within ten (10) calendar days after the close of each calendar month during the term of this Agreement. For calendar year 2005, AFMA has set the rate of contribution at 6/10 of one percent (.6%) of the Net Sales of Company. Although the present intention of AFMA is that such percentage rate of contribution will not exceed one percent (1%) of the Net Sales of Company, AFMA, at its option, at any time after December 31, 2004, upon thirty (30) days' advance written notice to Company, shall have the right to raise the contribution to the Marketing Support Fund to a rate of up to two percent (2%) of Net Sales.

3.2    During the first ninety (90) days of operation of the Store, on Monday of each week, Company shall make a weekly report by telephone to AFMA headquarters of the Store's Net Sales; provided, however, that in the event Company purchases the Store from AFMA or one of its Affiliates, such weekly reports shall be made during the first year of the operation of the Store of Company for the previous seven-day period to be delivered to AFMA by e-mail to the following address: Salesreports@theathletesfoot.com. Within ten (10) calendar days after the close of each calendar month during the term of this Agreement, Company shall submit to AFMA, along with the royalty fee and the contribution to the Marketing Support Fund for such month, an unaudited statement of the Net Sales for such month, in the form of Exhibit D attached hereto, prepared in accordance with generally accepted accounting principles. Company shall maintain such records and accounts, including, without limitation, all sales slips, bank statements and other sales records, as an independent certified public accountant would need to examine in order to certify Company's annual statement of Net Sales pursuant to generally accepted accounting principles. AFMA shall have the right, upon forty-eight (48) hours' prior written notice, to examine such records and accounts at mutually agreeable times during normal business hours. Such records and accounts may be disposed of by Company at any

- 5 -

time after the fifth anniversary of the end of the calendar year for which such records and accounts have been maintained. In the event that, pursuant to the terms of any lease of Store premises, the lessor conducts an audit of Company's Net Sales for purposes of verifying the percentage rent paid by Company to such lessor, Company shall deliver a copy of such audit report to AFMA within fifteen (15) days from the date of receipt by Company of such audit report.

3.3    (a)    Within ninety (90) days following the end of each fiscal year of Company, Company shall provide AFMA with financial statements prepared by a reputable accounting service in accordance with generally accepted accounting principles which shall consist of, at a minimum, (i) a balance sheet of Company as of the last day of the fiscal year and a balance sheet of each person who has executed the Shareholder/Partner/Member Guaranty as of the last day of the preceding calendar year; and (ii) an income statement of Company for the fiscal year. In addition, at the same time, Company shall provide a statement setting forth, in detail, the Net Sales of Company during any portion of such fiscal year and a report of the expenditure of the Annual Capital Expenditure Amount (as defined in Section 7.1(q)(i) below) and the advertising expenditures required by Section 7.1(j)(ii), the form of which appears in the Manual of Policies and Standards. In the event that, pursuant to the terms of any lease of Store premises, Company is required to provide a lessor with a statement substantially similar to a statement required herein prepared by a reputable accounting service, then such statement may be delivered to AFMA in substitution for the corresponding statement provided for herein. Company shall give AFMA notice of its intention to provide the alternative statement along with a copy of the applicable lease provision.

(b)    Within ninety (90) days following the end of each fiscal year of Company and based upon the sales figures as reported on the financial statements of Company which are provided to AFMA pursuant to Section 3.3(a) hereof, Company and AFMA shall make a year-end adjustment to the amount of royalty fees and Marketing Support Fund contribution paid by Company during such fiscal year in an amount necessary to cause the total royalty fees and Marketing Support Fund contribution actually paid by Company for such fiscal year to be in an amount equal to the amount to be paid for such year pursuant to Sections 3.1(a)(ii) and (b) above. AFB shall provide a credit to Company or Company shall pay to AFB, as the case may be, the amount necessary to accomplish such adjustment within ten (10) days of the completion of the calculation of such adjustment.

(c)    (i)    During the first twelve months in which the Store is open and operating, Company shall deliver to AFMA, along with each monthly statement of Net Sales to be delivered pursuant to Section 3.2, a computer diskette containing all of the information on the Inventory Control System (the "Inventory Control System Data") as of the close of business on the last day of the preceding month. After the first twelve months in which the Store is open and operating, within ten (10) days after a request from AFMA, Company shall deliver to AFMA a computer diskette containing the Inventory Control System Data as of the date of receipt by Company of AFMA's request.

(ii)    On or before September 1 in each year, Company shall deliver to AFMA a written report containing Company's sales forecast for the next calendar year. Such report shall be submitted on an Annual Sales Forecast Form which shall be provided to Company by AFMA. In addition, at the same time, Company shall deliver to AFMA a certificate of insurance showing that the insurance coverage required under Section 7.1(m) hereof is then in effect in the name of Company.

(d)    Along with the annual financial statements to be delivered by Company to AFMA pursuant to Section 3.3(a), Company shall deliver to AFMA a complete list of the vendor

account numbers established or maintained by Company during the preceding fiscal year. At the request of AFMA, Company shall submit to AFMA a written report of Company's annual purchases for the preceding fiscal year of Company, which purchases shall be listed by vendor.

(e)     Upon five (5) days written notice to Company, AFMA shall have the right to audit or cause to be audited, at any time up to five (5) years after the close of a fiscal year, the books and records of Company with respect to the Store for such fiscal year. In the event any such audit shall disclose an understatement of the Net Sales for any fiscal year(s), Company shall pay to AFMA, within fifteen (15) days after receipt of the audit report, the royalty fees and contributions to the Marketing Support Fund due on the amount of such understatement. In the event such understatement for any fiscal year(s) shall be two percent (2%) or more of the Net Sales for such fiscal year(s), Company shall pay to AFB or AFMA, as the case may be, within fifteen (15) days after receipt of the audit report, the royalty fees and contributions to the Marketing Support Fund due on the amount of the understatement, together with interest as provided in Section 3.6 from the date such payments were due and payable, and Company shall reimburse AFMA for the cost of the entire audit, including, without limitation, the charges of any independent accountant and the compensation of employees of AFMA and reasonable travel costs including food and lodging (the "Audit Costs"). In the event such understatement for any fiscal year(s) shall be in excess of five percent (5%) of the Net Sales for such fiscal year(s): (i) AFB shall have the right to collect royalty fees, and AFMA shall have the right to collect contributions to the Marketing Support Fund, on the amount of such understatement at the rates of eight percent (8%) and two percent (2%), respectively, together with interest as provided for in Section 3.6 from the date the royalty fee and contributions to the Marketing Support Fund were due and payable; (ii) Company shall reimburse AFMA for the Audit Costs; and (iii) either of the Franchising Entities shall have the right to terminate this Agreement. AFMA's right to audit the books and records of Company as provided for above shall survive the expiration or termination of this Agreement.

3.4     At the request of AFMA, Company shall submit to AFMA a copy of the state sales tax reports as filed by Company with appropriate state authorities. Such reports shall be submitted to AFMA within three (3) days of the request therefor and, upon request of AFMA, Company shall regularly submit such reports to AFMA within three (3) days of their submission to state authorities. All copies submitted to AFMA shall be certified by the Manager to be a true, correct and complete copy of the report submitted to state authorities by Company.

3.5     All initial fees, royalty fees, and contributions to the Marketing Support Fund shall be due and payable on the dates specified herein or therein regardless of any disputes or controversies between AFB and AFMA, on one hand and Company, on the other hand and/or Company and third parties. In the event of any such dispute or controversy, Company shall have all of the rights and remedies available to it under this Agreement or at law or in equity, except that Company shall not have the right to withhold payment of any amounts due and payable to AFB or AFMA while such dispute or controversy is pending.

3.6 Initial fees, royalty fees and contributions to the Marketing Support Fund not paid to AFB or AFMA, as the case may be, when due shall bear interest at the rate of one and one-half percent (1.5%) per month, or the highest rate of interest permitted by law, whichever is less. In addition, in the event AFMA is required to engage a collection agency or legal counsel or to commence and prosecute formal legal proceedings for the collection of such fees or, in the event AFMA decides to negotiate a settlement with Company in lieu of exercising its rights to terminate this Agreement as provided in Section 10, Company shall reimburse AFMA for any and all reasonable costs and expenses incurred by AFMA in connection with the engagement of such collection agency, the conduct of such legal proceedings or the conduct of such negotiations

- 7 -

including, without limitation, reasonable attorneys' fees and the filing fees and other costs incurred by AFMA in engaging such collection agency, in bringing such legal proceedings or in conducting such negotiations.

3.7     Prior to the opening of the Store, Company shall establish a separate account at a banking institution selected by Company which shall have capability for automatic funds transfer (the "Automatic Funds Transfer Account") and shall provide AFMA with all information regarding the Automatic Funds Transfer Account as is necessary for AFMA to establish an automatic funds transfer program with respect to the Automatic Funds Transfer Account. Company shall cooperate with AFMA or its authorized agent as necessary to establish the automatic funds transfer program and to authorize AFMA to direct automatic funds transfers from the Automatic Funds Transfer Account on the tenth day of each calendar month. If not previously paid to AFB or AFMA, Company shall deposit into the Automatic Funds Transfer Account, on or before the tenth calendar day of each calendar month, cash in an amount equal to the aggregate amount of the royalty fee and contribution to the Marketing Support Fund for the preceding calendar month. To the extent not previously paid by Company, Company hereby authorizes AFMA to direct a transfer of funds from the Automatic Funds Transfer Account to AFB and AFMA, as the case may be, in an amount equal to the aggregate amount of the royalty fee and Marketing Support Fund Contribution calculated on the basis of the most recent statement of monthly Net Sales delivered by Company to AFMA (whether or not for the immediately preceding calendar month).

4.     Other Stores in Company's Area of Responsibility

Except as expressly set forth in this Section 4, AFB agrees that it will neither open and operate any specialty retail athletic footwear stores under the Mark or using the System located in Company's Area of Responsibility nor grant any rights to any third party for the use of the Mark or the System for the operation of specialty retail athletic footwear stores located in Company's Area of Responsibility. AFB reserves, on behalf of itself and its Affiliates, the right to use, and to license the use of the Mark and the System in any and all ways other than by the operation of a specialty retail athletic footwear store under the Mark located in Company's Area of Responsibility (e.g., advertising and other promotion of the Mark and the System, sales via the Internet, catalog sales or other direct purchase programs) and to license others (including, without limitation, any Affiliates of AFB) to open stores operating under the Mark at any location outside Company's Area of Responsibility, in both cases, even if such use and such stores are geographically proximate to the Store and compete for customers within Company's Area of Responsibility. AFB may license others (including any Affiliates of AFB) to open stores operating under the Mark on the premises of theme parks, amusement parks, airports and sports arenas located in Company's Area of Responsibility which may compete for customers within Company's Area of Responsibility.

5.     Operation and Management of Store

5.1     In connection with the opening of the Store, upon Company's request and at Company's sole risk, AFMA shall provide the following initial services on behalf of AFB:

(a)     advise Company as to the topics of site selection, lease negotiation, store layout, physical structure, leasehold improvements and interior design for the Store (all of which are subject to the approval of AFMA as provided in Section 7.1(q)(ii) hereof);

(b)     advise Company as to initial orders of merchandise and initial inventories;

(c)     advise Company as to establishment and terms of business relations with major suppliers of athletic footwear and footwear accessory products;

(d)     create, prepare and make available to Company in connection with the opening of the Store advertising materials used by AFMA in connection with the Mark; and

(e)     provide a training program to the Executive and/or the initial Manager of the Store to explain AFMA's forms, systems and procedures for Store operation.  Training will include a review of the Operations/Training Manuals and the Manual of Policies and Standards. Such training shall include the "Fit Technician Training Program" (consisting of at least one (1) day of seminar training) and such other training programs as AFMA shall implement from time to time including, without limitation, programs to inform Company, through the Executive and such Manager, about new footwear technologies, sales techniques and other footwear issues. The initial training program for the Executive and the initial Manager of the Store prior to the opening of the Store shall consist of a minimum of four (4) days of training which shall be held at AFMA's offices. At the option, and upon the request of Company, AFMA shall provide a minimum of one (1) day and a maximum of three (3) days of actual in-store training and support for the Executive and such Manager in connection with the opening of the Store which will be conducted at a store operating under the Mark. AFMA shall provide training for the person(s) designated by Company as the Executive and Manager. The Executive and Manager shall receive training in order to prepare the Executive and Manager for implementing and administering AFMA's store training system and standards in the course of training other employees of Company. AFMA shall loan to Company for use by the Executive and Manager one copy of the Manual of Policies and Standards, the Operations/Training Manuals and other training-related manuals and programs which will include information for implementation of the store training system and the administration of store standards. There shall be no charge for any of the foregoing training programs; provided, however, that Company shall be responsible for the transportation and living expenses incurred by the Executive and Manager and any other representatives of Company in attending any such training program. Representatives of Company in addition to the Executive and the Manager shall be permitted to attend such initial training program; provided, however, AFMA reserves the right to limit training program participation to three (3) representatives from Company in any one training session. All training to be provided to the Executive and Manager shall be conducted at the regularly scheduled training sessions of AFMA.

5.2     In connection with the operation of the Store, at Company's sole risk, AFMA shall provide the following ongoing services on behalf of AFB:

(a)     advise Company as to its own merchandising, advertising, cost control and other ways of doing business, including but not limited to: establishing monthly sales plans, turnover rate, assortment planning by month and category, writing and processing purchase orders, profit and loss analysis, maintaining gross margins, cash flow analysis, in-store signage, lighting, office organization, bookkeeping, daily cash reporting, journal entry, sales tracking, personnel administration, employee interviewing, hiring and termination techniques, product knowledge, salesmanship, management information systems, training materials including product training systems and product training manuals and videos, furniture and fixtures, insurance, private label products, security systems, supplies, and use of the Inventory Control System.

(b)     advise Company as to subsequent orders of merchandise and inventories;

(c)     permit representatives of Company (including individuals who succeed Managers) to attend the regularly scheduled training programs conducted at AFMA's offices on a space available basis. There shall be no charge for any of the foregoing training programs; provided, however, that Company shall be responsible for the transportation and living expenses incurred by the representatives of Company in attending any such training program. AFMA reserves the right to limit training program participation to three (3) representatives from Company in any one training session.

5.3   With the exception of Company's obligations under this Agreement and matters relating to the use of the Mark and the System and the AFB Trade Dress, the advice and recommendations provided by AFMA are subject to the independent business judgment of Company and Company shall not be obligated to follow such advice and recommendations.

6.   AFB's Representations, Warranties and Covenants

6.1   AFB hereby represents and warrants to Company as follows, which representations and warranties shall be in effect during the entire term of this Agreement:

(a)   AFB has full right and authority to license the use of the Mark to Company in Company's Area of Responsibility to identify retail stores and goods sold through such retail stores, such as athletic footwear and footwear accessory products.

(b)   AFB has full right and authority to license the Mark and the System to Company for use in accordance with the terms of this Agreement.

(c)   AFB has licensed and will continue to license the use of the Mark and the System to others outside of Company's Area of Responsibility.

6.2   AFMA hereby represents, warrants, covenants and agrees with Company as follows, which representations, warranties and covenants shall be in effect during the entire term of this Agreement:

(a)   AFMA shall maintain and administer a marketing support fund (the "Marketing Support Fund") for the purposes of providing marketing materials such as public relations, in-store promotions and signage packages and market research for the benefit of Company and all stores operating under the Mark in the continental United States and Canada (collectively, the "Marketing Support Programs") which will promote consistency in advertising and marketing at the local level through the use of materials professionally produced through expenditures from the Marketing Support Fund. AFMA shall maintain a separate accounting for the proceeds of the Marketing Support Fund. AFMA shall create and direct the Marketing Support Programs in the exercise of its sole discretion and shall make disbursements from the Marketing Support Fund for the expenditures under the Marketing Support Programs, including, without limitation, production costs, media costs and the costs of promotional materials. AFMA has no obligation to administer the Marketing Support Programs in a manner which will ensure that any particular franchisee of AFMA benefits directly or pro rata from the Marketing Support Programs nor is AFMA obligated to ensure that expenditures are proportionate to contributions to the Marketing Support Fund in any given market area; provided, however, AFMA shall use commercially reasonable efforts to ensure that the expenditures from the Marketing Support Fund maintain and enhance the brand image of the Mark for the benefit of all stores operating under the Mark in the continental United States and Canada in the most cost-effective and equitable manner. AFMA is not obligated to expend the Marketing Support Fund within any particular time period or in any particular manner. AFMA shall cause its auditors to conduct an annual audit of the contributions to, and expenditures from, the Marketing Support Fund and to provide Company with a summary report of such audit. The costs of administering the Marketing Support Fund shall be paid from the Marketing Support Fund. AFMA shall be entitled to reimbursement of the costs incurred by them which are directly related to the administration of the Marketing Support Fund; provided, however, such reimbursement shall be only in such amounts as are necessary to make AFMA whole without providing a profit to it. AFMA shall use the Marketing Support Fund solely for

the Marketing Support Programs and the costs of administering the Marketing Support Fund. Company shall not be a third-party beneficiary with respect to the contributions made to the Marketing Support Fund by other franchisees of AFB.

(b)     AFMA shall maintain an Advisory Council comprised of members elected by the franchisees of AFB and two representatives selected by AFMA to represent the concerns of franchisees before the management of AFMA. The Advisory Council shall make recommendations to AFMA but shall have no decision-making authority.

(c)     AFMA shall loan to Company one copy of each of the Operations/Training Manual, the Manual of Policies and Standards and any and all other manuals and other information containing guidelines and operating procedures for the operation of the System. AFMA will periodically provide Company with modifications and updates to such manuals which shall supersede the previously existing guidelines and procedures. All of the manuals described above, as so modified and updated, are hereby incorporated by reference in this Agreement as if fully set forth herein.

(d)     AFMA shall organize and maintain the Goods Selection Committee. The Goods Selection Committee will advise, counsel with and recommend to AFMA those items of merchandise and the manufacturers and/or suppliers thereof to be included on the list of Approved Goods as well as recommend to AFMA changes to the existing list of Approved Goods. The foregoing notwithstanding, AFMA shall not be obligated to provide support or services to Company with respect to athletic clothing, luggage for athletic use and other related nonfootwear products in the event AFMA consents to such types of merchandise being carried in the Store. In this regard, AFMA shall have no obligation to assist Company in establishing accounts with vendors of such merchandise or to develop purchasing programs with respect to such merchandise.

6.3     AFB and AFMA hereby covenant and agree with Company that, during the entire term of this Agreement, AFB and AFMA will use the Store Operating Information solely for the purpose of assisting Company in the operation of the Store; provided, however, that AFB and AFMA shall have the right to combine the Store Operating Information with other data in a central database and, as long as the Store Operating Information is not identifiable to Company, to use the aggregate information in the central database (including the Store Operating Information) for any lawful purpose.

7.     <u>Company's Representations, Warranties and Covenants</u>

7.1     Company hereby represents, warrants, covenants and agrees with the Franchising Entities as follows, which representations, warranties and covenants shall be in effect during the entire term of this Agreement:

(a)     The Store shall be identified by the Mark and operated using the System and the AFB Trade Dress at all times during the full term of this Agreement. Company agrees to purchase all of the furniture, fixtures, signs, software, merchandise, merchandising supplies and equipment to be used in the operation of the Store only from approved suppliers.

(b)     In the operation and management of the Store, Company shall apply the System and each of the technical, commercial and administrative standards developed by AFMA, as the same may be amended from time to time. Company shall purchase all of the furniture, fixtures, signs, software supplies and equipment for the Store from an approved supplier.

(c)     The Store shall be used solely for the operation of a specialty retail athletic footwear business identified by the Mark and using the System, which shall include only the

business of the sale of footwear and footwear accessory products which constitute Approved Goods. Company shall notify AFMA immediately of the award of an account by each vendor of Approved Goods and such notice shall include the account number assigned to Company by such vendor. Except for programs sponsored by AFMA, Company shall not install, or permit third parties to install any telephone booths, newspaper racks, video games, jukeboxes, vending machines, rides, coin-operated devices or other similar devices in the Store.

(d)     Company shall designate the Executive and the Manager(s) to AFMA in writing at least ninety (90) days prior to the opening of the Store. Prior to the opening of the Store, the Executive and the Manager shall participate in and successfully complete AFMA's training program activities, which shall include a training program at AFMA's headquarters as described in Section 5.1(e) and, at the request of Company, participation in the actual operation of the business of a Store by serving as unpaid members of the staff of an AFMA-approved store operating under the Mark for forty (40) hours during a one-week period. At the option, and upon the request, of Company, Company shall cause the Executive and the Manager to attend the actual in-store training described in Section 5.1(e). All travel and living expenses incurred by the Executive and Manager in connection with such training program activities shall be borne by Company. Company shall cause its Managers to devote their full time and attention and best efforts to the performance, management and operation of the Store.

(e)     Company, at its option, shall have the right to have each person, who succeeds a Manager who has received training, participate in and successfully complete AFMA's next regularly scheduled training program activities as described in Section 7.1(d) above, subject to availability. Company shall notify AFMA in writing of the hiring of a new Manager within five (5) days of such person's hiring.

(f)     Net Sales shall be at least Five Hundred Thousand Dollars ($500,000) during each twelve (12) month period during the term of this Agreement. Company shall maintain a minimum inventory at the opening of the Store which has a cost to Company of at least Thirty Five Thousand Dollars ($35,000), and thereafter a minimum inventory of the Store which has a cost to Company equal to at least Seventy Thousand Dollars ($70,000).

Company acknowledges and agrees that no representation has been made by AFB or AFMA that the Store will achieve the minimum amount of Net Sales specified above and that such minimum amount of Net Sales is solely a minimum performance standard.

(g)     At all times during the term of this Agreement, the entire inventory of Goods for resale maintained in the Store shall consist of Approved Goods, unless prior written approval with respect to merchandise not constituting Approved Goods is obtained from the Goods Selection Committee, which approval shall not be unreasonably withheld.

(h)     Company shall comply with each of the standards and institute each of the procedures contained in the Operations/Training Manuals and the Manual of Policies and Standards and each other manual and guide loaned by AFMA to Company containing elements of the System, including all additions, deletions and amendments to such standards and procedures made by AFMA from time to time to such manuals or to the System. Company shall be obligated to comply with the revised standards and procedures within thirty (30) days a f t e r receipt from AFMA of each periodic update to such manuals.

(i)     Company shall use its best efforts to promote the use of the Mark in Company's Area of Responsibility and shall use the Mark in its business communications,

specifically on signs, billboards, literature and printed publicity materials and in printed advertisements in the press to the extent such forms of advertising and promotion are utilized by Company.

(j)     (i)     Company acknowledges and agrees that the Marketing Support Programs as funded by the Marketing Support Fund are intended to increase general public recognition and acceptance of the Mark for the benefit of AFB and its franchisees. Company understands and acknowledges that Marketing Support Programs to be implemented by AFMA will be utilized to maximize general public recognition of the Mark and that AFMA does not undertake any obligation in administering such program to ensure that expenditures are proportionate or equivalent to Company's contributions or are made for Company's Area of Responsibility or that Company will benefit directly or pro-rata from advertising and promotional programs. Company further acknowledges that it understands the purposes and manner of administering the Marketing Support Fund and authorizes AFMA to conduct the operation of the Marketing Support Fund in accordance with the provisions of this Agreement.

(ii)     Company shall spend a minimum amount equal to the sum of two percent (2%) of its Net Sales up to $600,000 plus one percent (1%) of its Net Sales in excess of $600,000 on local advertising and promotional activities during each twelve-month period after the opening of the Store.

(k)     Company shall use the Mark in Company's Area of Responsibility only in accordance with the terms and conditions of this Agreement and will not intentionally and/or knowingly do anything adversely to affect or impair the integrity of the Mark or the goodwill and prestige that the Mark enjoys with the public.

(l)     Company shall not manufacture, create or sell or cause to be manufactured, created or sold any item of Goods or supplies on which the Mark appears including, without limitation, all sales, promotional and advertising materials developed by Company in connection with the operation of the Store, unless Company first obtains the written authorization of AFMA, which authorization must be obtained in accordance with the procedures described in the Operations/Training Manual and the Manual of Policies and Standards. Any item of supplies (e.g., business cards, price tags, postcards, direct mail materials) on which the Mark appears which are not purchased through the supply department of AFMA or one of its Affiliates, as the case may be, must be authorized by AFMA as provided above.

(m)     (i)     Company shall at all times maintain in force, at its sole expense, public liability insurance in the amount of at least TWO MILLION DOLLARS ($2,000,000) per occurrence and general casualty insurance (including fire, theft, water damage and extended coverage) covering the Store and the merchandise stored therein with coverage for the full replacement cost thereof, without coinsurance, subject only to commercially reasonable deductibles reasonably acceptable to AFMA, worker's compensation as required by law and such other insurance as is required by AFMA under one or more policies of insurance and issued by reputable and solvent insurance carriers. All public liability insurance policies shall name AFB and AFMA as an additional insureds. Company shall submit to AFMA a copy of the certificate of, and evidence of the renewal or extension of, each such insurance policy upon request.

(ii)     Company agrees that all insurance policies obtained by Company pursuant to Section 7.1(m)(i) above shall be primary coverage, the applicable limits of which shall be exhausted before any benefits (defense or indemnity) may be obtained under any other insurance (including self-insurance) providing coverage to either AFB or AFMA. In the event payments are required to be made under the insurance policies of either AFB or AFMA or self-insurance (whether for defense or indemnity) before the applicable coverage limits for the

- 13 -

insurance policies obtained by Company are exhausted, then Company shall reimburse, hold harmless and indemnify each of AFB and AFMA and its insurers for such payments. Company shall notify its insurers of this Agreement and shall use best efforts to obtain the following endorsement on each policy it obtains pursuant to Section 7.1(m)(i) above:

The applicable limits of this policy shall be applied and exhausted before any benefits may be obtained (whether for defense or indemnity) under any other insurance (including self-insurance) that may provide coverage to either AFB or AFMA. All insurance coverage obtained by either AFB or AFMA shall be considered excess insurance with respect to this policy, the benefits of which excess insurance shall not be available until the applicable limits of this policy are exhausted.

(n)     Company acknowledges AFB's ownership and title to the Mark that is used in connection with the operation of retail stores identified as THE ATHLETE'S FOOT® as well as any copyrights or distinctive features of the labeling used in connection with the Mark and the distinctive business format and trade dress of the retail stores operated under the Mark. Company acknowledges that Company shall not, directly or indirectly or through any other entity directly or indirectly related to Company or its members, acquire or claim adversely to AFB any right, title or interest in and to the Mark per se or in combination with any other term or trademark or any such copyrights or distinctive features of the labeling used in connection with the Mark or the distinctive business format and trade dress used in the retail stores operated under the Mark. Company acknowledges that each and every use of the Mark by Company under this Agreement shall at all times inure to the benefit of AFB and Company shall execute any and all documents that may be submitted to Company reasonably necessary to carry out the intention of this covenant. This covenant shall survive the expiration or termination of this Agreement for any reason.

(o)     Except as permitted pursuant to Section 7.1(bb)(ii) below, Company shall not sell any merchandise that has the Mark affixed thereto in any business location which is not a Store. Company shall not divert or distribute any merchandise to any third party (other than AFB or licensees of AFB) in violation of the vendor's policy with respect to diversion or redistribution of such vendor's products.

(p)     Company shall conduct its business in full compliance with all applicable laws, ordinances and other governmental regulations, and Company shall obtain all necessary permits and licenses necessary for its operation of the Store. Company shall also conduct its business in accordance with good business practice and custom, which shall include, without limitation, the obligation of Company to pay all of its debts to creditors and suppliers as and when the same become due, to record all sales and other transactions through the use of a cash register and to preserve all cash register tapes as part of the business records of Company under Section 3.2 hereof.

(q)     (i)     Company acknowledges that AFB requires all stores operated by its franchisees to use the AFB Trade Dress and to maintain a uniform appearance for the mutual benefit of all stores. Company shall use the AFB Trade Dress and to maintain the Store, both interior and exterior, in conformity with such uniform appearance, and Company shall follow AFMA's advice and recommendations on the appearance of the Store. Company shall cause such changes to be made in the AFB Trade Dress and appearance of the Store and such upgrades to the Inventory Control System as may be specified by AFB from time to time; provided, however, that such changes and upgrades in any calendar year during the term of this Agreement shall cost no more than the sum of one percent (1%) of Company's Net Sales for the immediately preceding calendar year plus any unspent amount carried over from a previous

- 14 -

calendar year as described below (the "Annual Capital Expenditure Amount"). No such requests shall be made by AFB during the first year of the term of this Agreement. In the event that, during any calendar year, AFB does not make any such requests or the requests by AFB do not require the expenditure of the entire Annual Capital Expenditure Amount, Company shall have the option to cause the Annual Capital Expenditure Amount (or any remaining portion thereof) to be spent for the purposes of refurbishing the appearance of the Store and replacing fixtures as Company shall determine during such calendar year or to allow such unspent amount to carry over to the next calendar year and be aggregated with the Annual Capital Expenditure Amount for the next calendar year to establish the maximum amount of expenditure in the next calendar year. In addition, Company shall refurbish the Store at the end of each five (5) year period during the term of this Agreement as may be required by AFB. For purposes of this Agreement, the term "refurbish" shall mean such changes in storefront signage, painting, flooring, lighting, seating, cash wrap and shoe displays as are necessary to bring the Store up to the then-current standard for the design format of the Store.

(ii)     Company shall notify AFMA of the location at which Company proposes to open the Store. As a condition precedent to accepting the location identified by Company, Company shall have delivered to AFMA the information with respect to such location specified on Exhibit C attached hereto. AFMA shall notify Company as to its acceptance of such proposed location within twenty (20) days of its receipt of notice from Company. If the proposed location for the Store has been accepted by AFMA, Company shall act in good faith to negotiate and execute a lease for such location and Company shall submit to AFMA a copy of the lease for such proposed location immediately upon the execution thereof. Company shall not enter a lease for any Store location which contains a restrictive or noncompetition radius without the prior written consent of AFMA. Company shall submit to AFMA a copy of all architectural drawings and specifications for the construction of the Store showing leasehold improvements and interior design, including a lighting plan, a reflective ceiling plan, storefront elevation and interior elevations including floor layout, wall treatments, decoration, colors, fixtures, floor coverings and finishes and signs, for approval prior to the opening of the Store. AFMA shall notify Company of its approval or disapproval of the proposed drawings and specifications within ten (10) days of receipt thereof by AFMA. In the event of AFMA's disapproval, AFMA's notice to Company shall specify the changes to be made by Company in said drawings and specifications, and Company shall make the changes specified by AFMA prior to commencement of construction of the Store. Upon approval by AFMA of the drawings and specifications for the Store, Company shall construct and equip the Store in accordance with such drawings and specifications using approved materials and fixtures and equipment. In the event that Company fails to submit such drawings and specifications to AFMA for approval prior to the opening of the Store, or in the event the Store as opened fails to conform to such drawings and specifications and the uniform appearance of all stores required by AFMA, AFMA shall have the right to require Company to make such changes in the structure, leasehold improvements, interior design and appearance as are necessary to have the Store conform to the uniform appearance for all stores required by AFMA. Company shall not commence construction of any Store until the location of such Store has been accepted by AFMA and the lease for the Store and the architectural drawings and specifications for the construction of the Store have been approved by AFMA, and Company acknowledges and agrees that AFMA may take action to prevent the opening of the Store in the event Company fails to obtain such acceptance and approval from AFMA. Company shall open the Store for business no later than one hundred twenty (120) days after the execution of the lease for the premises of the Store.

(iii)     In the event Company, at any time during the term hereof, shall remodel, refurbish, rebuild or relocate the Store, the same shall be deemed to be the opening of a new Store and the provisions of Section 7.1(q)(ii) shall be applicable, and Company shall comply with such provisions.

- 15 -

(iv)    Intentionally deleted.

(r)    Except as expressly provided in this paragraph or in the lease for the premises of the Store, if applicable, the Store shall be open a minimum of eight (8) hours per day, six (6) days per week and such additional hours as may be required by the terms of the lease for the premises of the Store; provided, however, that Company shall have the right, at its option, to operate the Store additional days and additional hours in the day as is the custom of regional retail stores in and around Company's Area of Responsibility, and that Company shall have the right to close the Store in observance of legal and religious holidays and for the purpose of taking inventory, even if the result is that the Store will not remain open a minimum of eight (8) hours per day, six (6) days per week. Company will not operate the Store as a discount store, but Company shall have the right to hold sales and to discount Goods at various times in accordance with normal retail business practices. All sales of Goods made by Company shall be recorded through the cash register of the Store whether such sales are made from the premises of the Store or from an off-Store premises location.

(s)    Company shall use the Store for the sale of those items of athletic footwear and merchandise related to athletics and physical and mental well-being which constitute Approved Goods. Subject to the foregoing, the Company shall not allow, suffer or permit such premises to be used for any purpose, business, activity, use or function to which AFMA objects; provided, however, that AFMA shall not unreasonably object to the use of the Store. Company shall keep the Store in good repair and maintenance.

(t)    Company shall display the Mark at the Store subject to any lease provisions, city ordinances and reasonable good taste or custom as may be established in the area in which the Store is located.

(u)    AFMA's personnel shall have the right to enter upon the premises of the Store at any reasonable time for the purpose of examining the Store, having access to the Inventory Control System in order to analyze the information and data contained therein, conferring with Company and inspecting and checking merchandise, furnishings, fixtures and operating methods to ensure that the integrity of the Mark is being maintained. AFMA shall have the right to require Company to discontinue sales of Goods which are not of high quality in the trade or which do not uphold the integrity of the Mark or Goods previously included in Approved Goods which are no longer included in Approved Goods; provided, however, that Company shall have the right to sell its existing stock of Goods which are no longer included in Approved Goods in the ordinary course of business during a period of thirty (30) days following receipt of notice from AFMA. All such inspections, examinations and conferences shall be at the sole cost and expense of AFMA.

(v)    AFMA shall have the right to photograph the Store, its operations and exterior and interior, and the various items sold by the Store and to use any such photograph in any of its publicity or advertising including, without limitation, in the website maintained by AFMA. AFMA shall provide to Company, promptly upon request by Company, copies of such photographs at AFMA's cost.

(w)    Subject to the terms and conditions of this Agreement and except with the prior written consent of AFB, Company shall not, either directly or through any other entity directly or indirectly related to Company or its members: (i) attempt to register or to use the Mark or any words confusingly similar thereto, either alone or in combination with other words or logos, as part of any trademark, service mark or an Internet URL address or domain name; (ii) attempt to register or to use any trademark per se in any language or in combination with goods and services which registration and/or use would create a likelihood of confusion with respect to the

Mark; (iii) attempt to use the distinctive features of the labeling used in connection with the Mark; (iv) use the Mark in conjunction with any other words or symbols in Company's trade name or to identify the Store; (v) use the Mark or either of the words "ATHLETE'S" or "FOOT" in Company's corporate name; or (vi) use the Mark in any manner in any domain name or as part of any Website on the Internet except to the extent permitted by the Manual of Policies and Standards. The consent of AFB shall not be unreasonably withheld; provided, however, that AFB, in its sole discretion, shall make the determination of whether the trademark to be used or registered by Company is confusingly similar to the Mark or other distinctive features of the labeling used in connection with the Mark. In the event AFB makes such a determination, its consent may be withheld. This covenant shall survive the expiration or termination of this Agreement for any reason.

(x)     Company shall identify itself in all correspondence and other forms of business communications (excluding advertising) in its own name, followed by the words "d/b/a THE ATHLETE'S FOOT® under license from Athlete's Foot Brands, Inc." Company shall post notices in prominent places within the Store stating that AFB is the owner of the Mark and Company is an independent operator and licensed user of the Mark. In the event Company is required to register THE ATHLETE'S FOOT® as a business or trade name, at the request of AFB, Company shall deliver to AFB an executed termination of such registration to be held in escrow by AFB pending expiration or termination of this Agreement, at which time AFB is authorized by Company to file such termination with the appropriate governmental authorities.

(y)     Company shall immediately notify the Franchising Entities of any apparent infringement of or challenge to Company's use of the Mark, or any adverse claim of rights to the Mark, and Company shall not communicate with any person other than the Franchising Entities and counsel for the Franchising Entities or Company's counsel in connection with any such infringement, challenge or claim. Company shall proceed with the Franchising Entities in accordance with the provisions of Section 8 hereof with respect to any such infringement, challenge or claim.

(z)     (i)     Company shall not communicate or divulge to, or use for the benefit of any other person or entity, any Confidential Information or other information or knowledge concerning the business of AFB, AFMA or of the System which it may acquire by virtue of its operation of the Store under this Agreement, nor shall Company do any act prejudicial or injurious to the business of AFB or AFMA. Company hereby acknowledges its understanding that the System, including all Confidential Information or other information contained in AFMA's Operations/Training Manual, Manual of Policies and Standards and all other published and nonpublished material disseminated by AFMA to its franchisees, constitutes confidential proprietary data of AFMA and Company agrees not to communicate or divulge to or use such information for the benefit of any other person or entity. Company shall obtain a confidentiality agreement of like tenor from each of its officers, directors, stockholders, partners, members and employees in the form of Exhibit E attached hereto which will be kept on file at the offices of Company and be available for inspection at any time by AFMA.

(ii)     Company agrees that AFB maintains and may enforce a "zero tolerance" policy with respect to any sale or other redistribution by Company of Goods bought from vendors through accounts established by Company through its relationship with AFB including, without limitation, any communication of any Confidential Information or other information or knowledge concerning the business of the Franchising Entities or of the System or use for the benefit of any other person or entity. Company shall refrain from any and all activities which would violate such policy. Company acknowledges that violation of such policy may result in termination of this Agreement pursuant to Section 10.1(k) hereof.

- 17 -

(aa)    Company shall not: (i) adopt any Company trademark in connection with the sale of Goods through the Store without the prior written approval of AFB; or (ii) use any trademark or service mark other than the Mark in connection with the sale of Goods through the Store other than trademarks used by others and affixed to Goods purchased by Company for resale.

(bb)    (i)    During the term of this Agreement and as provided in Section 12.2, neither Company nor any of its members, directly or through any other entity directly or indirectly related to Company or its members, shall: (A) operate any business involving the sale of athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity), footwear accessory products or athletic apparel under any business or trade name other than the Mark at any location or by any other means (including, without limitation, sales via the Internet or catalog sales); or (B) conduct the sale of athletic footwear, footwear accessory products or athletic apparel under the Mark at any location outside of Company's Area of Responsibility or by any means (including, without limitation, sales via the Internet or catalog sales) other than the operation of a retail store located within Company's Area of Responsibility which has been approved by AFMA as provided in Section 7.1(q) hereof; or (C) upon expiration or termination of this Agreement, use the Mark or any trademark or trade name confusingly similar to the Mark at any location; or (D) divert or attempt to divert any business from AFB or other franchisees of AFB; or (E) employ or seek to employ any persons employed by AFB, AFMA or other franchisees of AFB (including, without limitation, any Affiliates of AFMA).

(ii)    Notwithstanding the provisions of Section 7.1(bb)(i) above, Company shall have the right to apply to AFMA for authorization to conduct temporary off-Store premises sales of Goods (whether or not bearing the Mark) in accordance with the procedures described in the Operations/Training Manual and the Manual of Policies and Standards.

(iii)    Company shall reimburse AFB in full for all costs and expenses incurred by AFB in enforcing the provisions of this Section 7.1(bb) including, without limitation, reasonable attorneys' fees.

(cc)    Company agrees that, when it participates in any exchange of merchandise between any stores operated by a franchisee of AFB through the AFB's stores exchange program or otherwise, such exchange will be conducted in accordance with the applicable provisions of the Operations/Training Manual and Manual of Policies and Standards.

(dd)    Company shall honor AFB's standard gift card regardless of place of issuance and shall comply with and abide by the uniform exchange and return policy established by AFB for all stores operated by franchisees of AFB.

(ee)    Company acknowledges that significant managerial efforts are required by Company for the proper operation of the Store and that the day-to-day operation of the Store is the responsibility of Company. Company further acknowledges that neither AFB nor AFMA has made any guarantee or representation as to the performance, sales, income or profits of the Store to be operated by Company. Company shall operate the Store at its own risk and for its own account.

(ff)    (i)    As a condition to initial and continuing eligibility to participate in the Private Label Goods Program, Company shall sell the Private Label Goods only through the Store at retail directly to the ultimate consumer. Company shall not, without the prior written consent of AFMA, permit any of the Private Label Goods purchased by Company to be sold to or by any person or entity conducting business under any business name or trade name other than the Mark if such business involves the wholesale or retail sale of goods.

- 18 -

(ii)     Intentionally deleted.

(iii)     Company shall participate in all in-Store promotional programs sponsored by AFMA and offered to its franchisees.

(gg)     Company shall give serious consideration to each recommendation of the AFMA Advisory Council.

(hh)     Each member of Company shall sign the Member Guaranty or a counterpart thereof within ten (10) days of becoming a shareholder/partner/member of Company. Upon the request of AFMA, Company shall deliver to AFMA: (i) certified copies of the documents evidencing its formation and organization (e.g., certificate of organization, operating agreement) and a good standing certificate from the state of its formation confirming Company's continuing existence; and (ii) a list of the owners of Company showing the percentage ownership interest of each such owner.

(ii)     Company shall open and operate the Store for the full term of this Agreement.  Subject to the delivery by Company of the financial statements required under Section 3.3(a) above without default from and after the date of this Agreement, Company may close the Store at any time if the Store has operated at a loss during the period of the twelve (12) consecutive months prior to such closing and further provided that, upon such closing, the location of the closed store shall be subject to the provisions of Section 12.2 hereof.

(jj)     (i)     A representative of Company shall attend the scheduled international franchisee conferences of AFMA. All expenses related to convention attendance which are not paid by AFB as part of the conference package available to all franchisees of AFB shall be paid by Company.

(ii)     A representative of Company shall attend at least fifty percent (50%) of the regional meetings of the franchisees of AFB scheduled by AFB during each year. All expenses related to attendance at such regional meetings shall be paid by Company.

(kk)     Company shall use in the Store only approved bags which Company may obtain from AFMA or from suppliers that have been approved by AFMA.

(ll)     Company shall purchase an Inventory Control System and shall purchase or license and maintain an "open to buy" software program, each of which shall be approved by AFMA for tracking purchase orders, updating inventory and analysis of financial information from a vendor or lessor approved by AFMA. In addition, Company shall maintain freestanding facsimile transmission equipment with a dedicated telephone line and, in connection with its computer system, a modem for the purposes of providing AFMA with access to the information contained in the Inventory Control System and exchanging information with AFMA. Company shall cause its computer to have the capability to send and receive electronic mail between it and AFMA and to access the AFB Website on the Internet for the purpose of receiving communications from either AFB or AFMA to the franchise owners. AFMA shall have electronic access to the Inventory Control System for the sole purpose of obtaining the information relating to Net Sales, inventory levels, aged inventory and cost of goods sold (collectively, the "Store Operating Information"). Company hereby authorizes AFMA to access the Inventory Control System and to obtain such information contained therein. Such electronic access to the Inventory Control System shall be available to AFMA on a daily basis, twenty-four hours a day. Company shall upgrade and/or update the Inventory Control System as required by AFMA from time to time in order to maintain AFMA's approval of the Inventory Control System. Upon the request of AFB or AFMA at any time during the term of this Agreement, Company shall cause the Inventory Control System to be programmed

- 19 -

in a manner which will deliver the Store Operating Information, automatically in electronic format at such intervals as may be reasonably prescribed by AFB or AFMA, to a central database maintained by AFB or AFMA and to which only AFB, AFMA and their Affiliates have access.

(mm) Company acknowledges that the grant of rights to Company in Company's Area of Responsibility as provided for in Section 2 confers upon Company no marketing or territorial exclusivity or protection except as expressly provided for therein. AFB has certain rights reserved to it within and outside Company's Area of Responsibility (and, if AFB so determines, in close proximity to the Store) to own and operate stores under the Mark; to franchise other stores under the Mark; and to otherwise use the System, the Mark and the know-how, techniques and procedures associated therewith, including, without limitation, those rights expressly set forth in Section 4 of this Agreement.

(nn) Company acknowledges that it has been advised by AFB to consult with its own advisors with respect to the legal, financial and other aspects of this Agreement, the business franchised hereby, and the prospects for that business. Company acknowledges that it has either consulted with such advisors or has deliberately declined to do so.

(oo) Company affirms that all information set forth in all applications, financial statements and submissions to AFMA is true, complete and accurate in all respects, with Company expressly acknowledging that each of AFB and AFMA is relying upon the truthfulness, completeness and accuracy of such information.

(pp) Company acknowledges and agrees that, in the negotiation of the terms of this Agreement, the governing law and jurisdiction and venue provisions set forth in Section 15 hereof were bargained for between Company and AFMA and consideration was given to Company in respect of other terms of this Agreement based upon Company's willingness to agree to such provisions.

8. <u>Litigation</u>

8.1 In the event a suit in equity or action at law is brought against Company and/or AFB alleging that Company and/or AFB has no right to use the Mark in connection with the sale of Goods in Company's Area of Responsibility, AFB, with the cooperation of Company, shall assume the defense of such suit or action. Such defense shall be controlled and coordinated by trademark counsel, as chosen by AFB. AFB shall bear all costs of maintaining such defense.

8.2 (a) With respect to the use of the Mark by unlicensed third parties, if Company requests AFB to take legal action to protect or enforce its trademark rights in Company's Area of Responsibility, AFB, with the cooperation of Company, shall take such legal action as AFB deems appropriate in order to protect or enforce Company's and/or AFB's trademark rights. Such legal action shall be controlled and coordinated by trademark counsel, as chosen by AFB. AFB shall bear the costs of taking such action to protect or enforce the trademark rights. Any proceeds recovered as a result of such legal action shall be the sole property of AFB.

(b) (i) In the event Company believes that an unlicensed third party is using a name confusingly similar to THE ATHLETE'S FOOT® in Company's Area of Responsibility, AFB and Company shall attempt to agree on a mutually acceptable course of action to be taken to protect or enforce the trademark rights. In the event any such course of action is taken, such action shall be controlled and coordinated by trademark counsel, as chosen by AFB, and AFB and

Company shall share equally the costs of taking such action to protect or enforce the trademark rights. Any proceeds recovered as a result of such action shall be shared equally by Company and AFB.

(ii)     If AFB does not believe the use of the name by a third party is confusingly similar to THE ATHLETE'S FOOT® based upon the advice of its counsel, Company may proceed alone to take such action as it deems appropriate to protect or enforce its trademark rights under this Agreement, and Company shall bear all costs of such action. AFB shall provide Company full cooperation to enable Company to enforce its trademark rights under this Agreement if Company decides to take such action; provided, however, AFB shall not involuntarily become a party to such action. Any proceeds recovered by Company as a result of such action shall be the sole property of Company.

8.3     Company and AFB agree that each party shall keep the other promptly informed of any use of the Mark or any use of a name confusingly similar to THE ATHLETE'S FOOT® by unlicensed third parties in Company's Area of Responsibility.

## 9.     Term of Agreement

9.1     (a)     The term of this Agreement shall be for a period of ten (10) complete and consecutive years from the date of its execution, unless sooner terminated or extended as herein provided.

(b)     Company's right to use the Mark, the System and the AFB Trade Dress may be extended for successive additional periods of five (5) years each upon satisfaction of the following terms and conditions at the time of each such extension:

(i)     Company shall give written notice to AFB not less than one (1) year in advance of the expiration of the original term of this Agreement of its desire to extend the term of this Agreement;

(ii)     Company shall meet the then-current standards for a new franchisee of AFB;

(iii)     Company shall not be in default in its obligations under this Agreement including, but not limited to, the obligation to be current in the payment of all of its monetary obligations owed to AFB;

(iv)     Company shall sign the then-current form of Operating Agreement in use by AFB as identified in AFB's Uniform Franchise Offering Circular for new franchisees, which could have provisions that differ substantially from those contained in this Agreement, including, but not limited to, a higher royalty fee and Marketing Support Fund contributions and a different definition of Company's Area of Responsibility, which may include a smaller geographic area than that described in this Agreement; and

(v)     AFB shall have the right to require Company to remodel, update and/or upgrade the interior, signage and storefront of the Store if the Store does not conform to the desired uniform appearance required by the terms of the then-current form of Operating Agreement in use by AFB as identified in AFB's Uniform Franchise Offering Circular as a condition of renewal.

In the event of the failure by Company to satisfy any of the foregoing conditions, AFB shall have the right, in the exercise of its sole and absolute discretion, to

- 21 -

determine whether Company shall be entitled to extend its right to operate the Store using the System and identified by the Mark.

10.    AFB's Right to Terminate

10.1    AFB may terminate this Agreement by giving written notice to Company upon the occurrence of any of the following events:

(a)    Company fails to make payment of any royalty fee or Marketing Support Fund contribution or to submit any periodic report within ten (10) days after receipt of a notice of such default or thirty (30) days of the due date of payment, whichever is the shorter period;

(b)    Company is more than sixty (60) days past due in its obligations to suppliers and trade creditors in an amount exceeding Five Thousand Dollars ($5,000); provided, however, that in the event Company's failure to pay its suppliers and/or trade creditors is the result of a reasonable dispute with such supplier or trade creditor, notice of which has been given to AFMA, and Company, diligently and in good faith, is attempting to resolve such dispute, the amount of the disputed claim shall not be counted in making the determination of the dollar limitation set forth above;

(c)    Company fails to file any periodic report required hereunder on a timely basis three (3) or more times in any one calendar year, whether or not Company subsequently cures the default;

(d)    Company is unable to acquire a new Store location within one hundred twenty (120) days of the closing of the Store due to the expiration or termination of the lease for the Store;

(e)    Company does not commence the rebuilding of the Store within one hundred twenty (120) days after the destruction of the Store and diligently pursue such rebuilding to completion;

(f)    Company or a principal officer of Company is convicted of a felony or of a crime reasonably likely to have an adverse effect on Company's ability to do business or which would substantially impair the goodwill associated with the Mark;

(g)    Company engages in fraudulent practices, including, but not limited to, submitting false reports or financial statements, whether prior to or after the date hereof (including, without limitation, a material understatement of Net Sales as provided in Section 3.3);

(h)    Company fails to make the changes in structure, leasehold improvements, interior design and appearance required under Section 7.1(q)(i) within ninety (90) days after the request of AFMA;

(i)    Company breaches its obligations under Section 7.1(o) or Section 7.1(bb) of this Agreement;

(j)    A default by Company in its performance of any of its other obligations or covenants under the terms of this Agreement, which default continues uncorrected for a period of thirty (30) days after receipt of a communication specifying the default from AFB; provided, however, that if such default is incapable of cure within the aforesaid thirty (30) day period and

Company, diligently and in good faith is attempting to cure such default, AFMA shall not have the right to terminate this Agreement as long as Company is diligently pursuing such good faith efforts to cure such default;

(k)     Company breaches its obligations under Section 7.1(z)(ii) of this Agreement;

(l)     Company fails to fund the Automatic Funds Transfer Account in a timely manner as provided in Section 3.7 three (3) or more times in any twelve (12) month period, whether or not Company subsequently cures the default;

(m)     Company closes the Store pursuant to Section 7.1(ii) and does not reopen the Store in a new location within one hundred twenty (120) days of such closing;

(n)     Three (3) or more notices of default are sent to Company by AFMA in any twelve (12) month period, whether or not Company subsequently cures the default;

(o)     The revocation or lack of enforceability of the Member Guaranty;

(p)     Use of the Mark or the conduct of off-Store premises sales of Goods without the prior authorization of AFMA in accordance with the procedures described in the Operations/Training Manual and Manual of Policies and Standards; or

(q)     Company fails to cause the amendment to this Agreement referred to in Section 2.3 or any other mutually agreed upon amendment to this Agreement to be properly executed and delivered to AFMA within thirty (30) days of submission to Company.

10.2    This Agreement shall terminate automatically upon the occurrence of any of the following events:

(a)     The filing by or against Company of a petition in bankruptcy or insolvency, for reorganization or for the appointment of a receiver or trustee of all or a portion of Company's property; provided, however, that in the event of a filing against Company, such termination shall become effective only if Company fails to secure a discharge thereof within thirty (30) days of such filing; or

(b)     Company exercises its right to close the Store pursuant to Section 7.1(ii) and does not reopen the Store in a new location within one hundred eighty (180) days of such closing.

11.    <u>Company's Right to Terminate; AFB's Right of First Refusal</u>

11.1 Company may terminate this Agreement by giving written notice to AFB upon the occurrence of any of the following events:

(a)     The filing by or against AFB of a petition in bankruptcy or insolvency, for reorganization or for the appointment of a receiver or trustee of all or a portion of AFB's property, provided that in the event of a filing against AFB, such termination shall become effective only if AFB fails to secure a discharge thereof within thirty (30) days of such filing;

(b)     AFB makes an assignment for the benefit of its creditors; or

(c)     A material breach by AFB or AFMA of any of the representations, warranties or covenants contained in Section 6 of this Agreement, which breach continues uncorrected for a period of sixty (60) days after receipt of communication from Company

specifying the breach; provided, however, that if such breach is incapable of cure within the aforesaid sixty (60) day period and AFB or AFMA, diligently and in good faith, is attempting to cure such breach, Company shall not have the right to terminate this Agreement as long as AFB or AFMA is diligently pursuing such good faith efforts to cure such breach.

11.2    In the event that, during the term of this Agreement or during the one (1) year period of noncompetition following the expiration or termination of this Agreement as provided for in Section 12.2 (the "Right of First Refusal Period"), either: (i) Company receives a bona fide independent written offer from an independent, unaffiliated third party (the "Independent Offer") to purchase or acquire all or substantially all of the assets of Company (including, without limitation, the lease for the premises of the Store which shall be subject to the provisions of this Section 11.2 whether being purchased alone or in conjunction with the other assets of Company); or (ii) Company or the members of Company receive an Independent Offer to purchase or acquire twenty-five percent (25%) or more of the member interests (the "Ownership Interests") in Company, Company shall have the right to transfer all or substantially all of its assets or the/members of Company shall have the right to sell the Ownership Interests in Company pursuant to the Independent Offer; provided, however, that each of the following conditions is met:

(a)    Company shall first make a written offer to the Franchising Entities to sell such assets of Company or the owners of Company shall make a written offer to the Franchising Entities to sell the -Ownership Interests, as the case may be, at the purchase price and in the manner contemplated by the Independent Offer. Such written offer shall include a copy of the Independent Offer and a copy of the balance sheet and income statement of Company for the most recently completed fiscal period of Company and all other information with regard to Company and its operations which have been provided to the third-party offer or making the Independent Offer. The Franchising Entities shall then have a period of thirty (30) days after receipt of such written offer to deliver notice to Company of its election to purchase the assets or Ownership Interests which are the subject of the Independent Offer, upon the same terms and conditions as set forth in the Independent Offer (the "Right of First Refusal"); provided, however, that in the event that such terms and conditions require the payment and/or performance of non-cash consideration, the Franchising Entities shall be entitled to tender either payment and/or performance of such non-cash consideration or the cash equivalent of such non-cash consideration; and further provided that in the event the Independent Offer sets a closing date for the purchase and sale of such assets or Ownership Interests which is prior to the expiration of the thirty (30) day election period set forth above, such closing date shall, for purposes of this Section 11.2, be deemed extended to the ninetieth (90th) day following receipt of the Independent Offer by the Franchising Entities.

(b)    In the event that the Franchising Entities fail to exercise the Right of First Refusal, Company shall then be entitled to dispose of all or a part of such assets, or the members or owners shall be entitled to dispose of their Ownership Interests in Company, as the case may be, on the terms and conditions set forth in the Independent Offer, free of any restriction imposed by this Agreement within a period of ninety (90) days following the end of the aforesaid thirty (30) day period upon compliance with the provisions of Section 11.2(c) below. If such transfer is not consummated within such ninety (90) day period, Company's assets and the members' Ownership Interests shall once again become subject to the restrictions imposed by this Agreement.

(c)    During the Right of First Refusal Period, in the event that the Franchising Entities fail to exercise the Right of First Refusal and Company seeks to dispose of all or substantially all of its assets (including, the transfer or assignment solely of the lease for the premises of the Store) or the members seek to dispose of all or part of their Ownership Interests in Company on the terms and conditions set forth in the Independent Offer, and the proposed transferee intends to continue the business operated by Company or to operate a business of the

type described in Section 12.2, such right to disposition shall be expressly conditioned upon and may not be exercised without Company's first having performed each of the following obligations: (i) Company shall have secured from AFB the approval of the acquiring person or entity as having met the then-existing qualifications for a franchisee of AFB; (ii) Company shall have paid all royalty fees, contributions to the Marketing Support Fund and other invoices then due but unpaid to AFB or AFMA, as the case may be; (iii) Company shall have paid a transfer fee to AFB of: (A) not more than Ten Thousand Dollars ($10,000) in the case of a transfer to an existing franchisee of AFB; or (B) not more than Twenty Four Thousand Five Hundred Dollars ($24,500) in the case of a transferee who is not a franchisee of AFB, in each case for the costs of handling the transfer documentation and, in the case of a non-franchisee transferee, for the costs of qualifying and approving such transferee and providing training to such transferee; (iv) Company shall have secured from the acquiring person or entity an unconditional commitment, in writing, that: (A) the Store being acquired will continue to operate under the Mark and using the System; (B) the acquiring person or an officer of the acquiring entity shall visit AFMA's corporate headquarters for an orientation meeting; (C) the acquiring person or entity shall execute an Operating Agreement with AFB and AFMA containing terms and conditions substantially similar to this Operating Agreement; provided, however, no initial fee for the Store being acquired shall be due and payable pursuant to Section 3.1(a) of such Operating Agreement; but the rate of the royalty fee set forth in Section 3.1(a)(ii) shall become the then-current rate being charged to new franchisees of AFB; (D) the area of responsibility for the acquiring person or entity shall be determined by AFB using the standards customarily used by AFB in determining the area of responsibility for a new franchisee of the right to use Mark and System; and (E) the acquiring person or entity shall cause the intended Managers of the Store to attend and successfully complete the AFB's training program described in Section 5.1(e) hereof prior to the change of management control over the Store; and (v) Company shall have executed and delivered to AFB a general release of all claims against AFB and AFMA.

(d) In the event of a default by Company in the performance of its obligations under Section 11.2(c), Company agrees to pay to AFB, as liquidated damages and not as a penalty, an amount equal to the product of: (i) the sum of the average annual amount of: (A) royalty fees; and (B) Marketing Support Fund contributions payable by Company under this Agreement for the last three complete calendar years prior to the date of the occurrence of the default by Company; and (ii) the number of years remaining in the term of this Agreement, such amount to be payable upon the demand of AFB at any time on or after the date of the occurrence of such default to the extent permitted by applicable law. Company hereby acknowledges and agrees that the amount of liquidated damages determined in accordance with the preceding sentence reasonably represents the monetary loss to be suffered by AFB on account of the default by Company under Section 11.2(c).

(e) Subject to the provisions of Section 13 of this Agreement, nothing herein shall restrict the right of Company to mortgage or pledge all or part of its assets, or the right of its members to pledge all or a part of the Ownership Interests in Company, to a bank or other lending institution advancing funds necessary for the opening and operation of the Store.

11.3 Company shall not voluntarily or involuntarily, directly or indirectly, sell, transfer or otherwise dispose of (including, without limitation, by operation of law, by will, declaration of or transfer in trust or under the laws of intestate succession) the assets of the Store nor will Company permit the voluntary, involuntary, direct or indirect sale or transfer of more than twenty-five percent (25%) of the Ownership Interests in Company from the owners thereof on the date of this Agreement (whether in a single transaction or a series of transactions) without compliance with the terms of Section 11.2 hereof. All members of Company must sign the Member Guaranty at the time

of the execution of this Agreement by Company. All new members of Company must sign a counterpart of the Member Guaranty as a condition of obtaining the consent of AFB to any assignment or transfer of the Ownership Interests of Company.

12.    Company's Obligations on Termination

12.1    Upon expiration or termination of this Agreement for any reason, Company shall:

(a)    Discontinue all use of the Mark, all use of the System, all use of any of AFB's copyrights or the distinctive features of the AFB Trade Dress used in connection with the Mark and all use of any goods, bags or supplies bearing the Mark and make disposition of the AFB Trade Dress as prescribed on Exhibit B attached hereto;

(b)    Make or cause to be made such changes in signs, buildings and structures so as to indicate to the public that Company is no longer associated with AFB in any manner and is no longer entitled to use the Mark or the System and shall vacate the premises of the Store promptly and completely;

(c)    Close all of its accounts with vendors of Goods; and

(d)    Cancel all fictitious, tradename or business name registrations of the name THE ATHLETE'S FOOT® made with any governmental authority or agency.

Company acknowledges and agrees that AFB has the right to notify vendors of Goods with whom Company had accounts of the expiration or termination of this Agreement and that such vendors must close the accounts of Company which were opened in connection with the opening and operation of the Store.

12.2    Upon expiration or termination of this Agreement under the provisions of Section 9.1, 10.1 or 10.2, neither Company, directly or through any other person or entities directly or indirectly related to Company or Company's members, nor any of Company's members will own, operate or conduct any business that offers for sale athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity), footwear accessory products, athletic apparel or any other products or services which are similar in kind or nature to those offered by Company under this Agreement or are competitive with the products or services being offered by stores operated under the Mark for a period of one (1) year in the Company's Area of Non-Competition; provided, however, that the area encompassed by a ten (10) mile radius around any other stores operating under the Mark on the date hereof which are closed between the date hereof and the date of such expiration or termination of this Agreement shall be automatically excluded from Company's Area of Non-Competition. In the event Company fails to honor its obligation not to compete with AFB as set forth above, the term of Company's non-competition obligation shall be extended for a period of time equal to the period of time during which Company fails to comply with the provisions of this Section 12; it being the intent of the parties that AFB shall be entitled to a period of one (1) full year during which Company shall not compete with AFB as provided herein. If any provision of this Section is held to be invalid, unenforceable or over broad by reason of any rule of law or public policy as applied to any party or to any circumstances, such provision shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstance, or the validity or enforceability of this Agreement. If any provision or part thereof, however, is held to be unenforceable because of the duration thereof or the area covered thereby, the parties agree that such provision may be amended by a court of competent jurisdiction to reflect a reasonable period of duration and/or a reasonable geographic area for such covenant not

to conduct any business or operate any stores involving the sale of athletic footwear or sporting goods, and/or to delete specific words or phrases, and in its amended form, such provision shall be enforceable.

12.3    Upon the expiration or termination of this Agreement for any reason, Company shall return to AFB the Operations/Training Manual and The Manual of Policies and Standards and all manuals, tapes and other materials which are part of the System and which were provided to Company at any time, together with any and all copies thereof which were made by Company.

12.4    Upon expiration or termination of this Agreement for any reason, Company shall take all actions as may be necessary or required to cancel or transfer to AFB or its designee all rights which Company has in any telephone numbers and all classified and other directory listings for the Store. Company acknowledges that as between AFB and Company, AFB has the sole rights to and interest in all telephone numbers, facsimile numbers and directory listings associated with the Mark, and Company hereby authorizes AFB to direct the telephone company and all listing agencies to transfer same to AFB or its designee, should Company fail or refuse to do so, and to forward all calls to such telephone numbers to THE ATHLETE'S FOOT® toll free locator service. The telephone company and all listing agencies may accept such direction or this Agreement as conclusive evidence of the exclusive rights of AFB in such telephone numbers and directory listings and its authority to direct their transfer.

12.5    Upon expiration or termination of this Agreement under Section 9 or Section 10, at the option of AFB, Company shall assign to AFB all of Company's right, title and interest in and to any lease, sublease or right of entry for the premises of the Store and provide all necessary assistance to AFB in order to enable it to take prompt possession thereof.

12.6    Upon expiration or termination of this Agreement for any reason, Company shall take all actions necessary to cancel all fictitious, trade or business name registrations, all e-mail addresses and all Internet URL addresses or domain names registered by Company (notwithstanding the restriction set forth in Section 7.1(w) hereof) which include either of the words "Athlete's" or "Foot" and Company hereby authorizes AFB to execute and file on behalf of Company any and all documents which are necessary to cancel such registrations on the public record.

12.7    The covenants of this Section 12 shall survive the expiration or termination of this Agreement. Company acknowledges and agrees that the foregoing non-competition agreement is reasonable because it is necessary in order to allow AFB a reasonable amount of time to develop a new franchisee in Company's Area of Responsibility and to allow such franchisee to open its business. Company shall reimburse AFB in full for all costs and expenses incurred by AFB in enforcing the provisions of this Section 12, including, without limitation, reasonable attorneys' fees.

13.    Grant of Security Interest

13.1 For valuable consideration, receipt of which is hereby acknowledged, Company hereby grants to AFB a security interest in all of Company's rights in its leasehold interest for the Store and in all of Company's assets, whether now owned or hereafter acquired, used in connection with the Store, including, without limitation, all Goods, Equipment (other than leasehold improvements which constitute fixtures), Inventory, Instruments, Accounts, Chattel Paper, General Intangibles (including general intangibles that are classified otherwise under Revised Article 9 of the UCC), Deposit Accounts, Electronic Chattel Paper, Letter of Credit Rights, Software (as such terms are defined in the UCC) and any other property, and any and all additions and accessions thereto, all substitutions and replacements therefor and all products and

- 27 -

proceeds thereof or proceeds of insurance thereon, as security for the payment of all obligations owed by Company to AFB or any of its Affiliates including, without limitation, royalty fees, Marketing Support Fund contributions, invoices for merchandise and any and all other fees and amounts owed by Company to AFB hereunder. Company acknowledges that this Agreement shall constitute a security agreement under the UCC for purposes of establishing the respective rights of AFB and Company in the above-described personal property and the enforcement of such security interest against Company.

13.2 Company hereby authorizes AFB simultaneously with the execution of this Agreement to file one or more financing statements pursuant to the UCC. AFB agrees not to record any such financing statement until a mutually acceptable location for the Store has been agreed upon by AFB and Company.

13.3 Upon the occurrence of any of the events described in Section 10 of this Agreement, AFB shall have the rights and remedies of a secured party under the UCC.

14.      Hold Harmless

14.4 Except as provided in Section 8, Company shall indemnify AFB and AFMA and hold it harmless from and against any damage, loss, expense, obligation or other cost incurred in connection with Company's operation of the Store.

14.2 AFB shall indemnify and hold Company harmless from and against any damage, loss or expense, other than lost profits, suffered, paid or incurred by Company arising out of any material, inaccurate representation or warranty or any material breach of covenant by AFB under the terms of Section 6.1(a) hereof.

14.3 Company is an independent contractor and is not the agent, joint venturer, partner or employee of AFB or AFMA and neither AFB nor AFMA shall be obligated by any agreements, representations or warranties made by Company to any person. Neither AFB nor AFMA shall be obligated for any damages to any person caused by Company's action, failure to act, negligence, recklessness or willful misconduct. Company specifically acknowledges and agrees that neither AFB nor AFMA controls or supervises the day-to-day operations of the Store.

15.   Governing Law; Dispute Resolution

15.1    (a)     The interpretation and enforcement of this Agreement and all of the parties' rights and obligations with respect to each other, whether arising under this Agreement or any statute or regulation or at common law, shall be interpreted, construed, governed and enforced under and by the internal laws of the Commonwealth of Pennsylvania, without regard to its conflicts of laws principles.

(b) Company hereby acknowledges that, due to the founding of THE ATHLETE'S FOOT® franchise concept in Pittsburgh, Pennsylvania, and the location of principal place of business there for the first fourteen years of the existence of the franchise business, the franchise agreements now held by AFB specify Pennsylvania law as the governing law. Notwithstanding the subsequent relocation of the principal place of business, AFB has retained Pennsylvania law as the governing law of all of its franchise agreements in the interests of uniformity in the interpretation of the provisions of the franchise agreements for the benefit of AFB and all of its franchisees in the United States.

15.2    (a)     In the event of any controversy, dispute or claim (individually, a "Claim" and collectively, "Claims") arising out of or relating to this Agreement, or any modification, amendment

- 28 -

or extension to this Agreement, or the breach thereof, including any claim to rescind or set aside any of the same other than: (i) disputes involving the use of the Mark or the System; (ii) suits to enforce the in-term and post-term noncompetition agreements of Company; or (iii) actions by AFB for the collection of amounts due from Company (collectively, the "Non-Mediation Matters"), representatives of the Franchising Entities and Company shall meet in good faith as set forth in this Section 15.2 in an effort to resolve the dispute.

(b)     The disputing party shall give the other party written notice (the "Notice") of the dispute within thirty (30) days of becoming aware of the existence of the dispute. The Notice shall describe in reasonable detail the dispute and shall name a designee to participate in the meeting described in this section. Within fifteen (15) days of receipt of the Notice, the other party shall appoint a designee to meet and confer in an attempt to resolve the dispute. The failure of either party to appoint a designee or to present that designee for a meeting shall be considered a material breach of this Agreement. The designees of AFB, AFMA and Company shall meet at AFB's corporate offices at a time mutually acceptable to them to attempt to settle the dispute in good faith. This meeting shall be held within thirty (30) days after receipt of the disputing party's Notice. In the event that no resolution of the dispute is reached within thirty (30) days following the meeting, the dispute shall be submitted for a non-binding mediation with a mediator selected from a list of mediators to be obtained from the CPR Institute for Dispute Resolution ("CPR"). Upon expiration of the thirty (30) day period following the meeting, either AFB or Company may petition the CPR for a regional list of mediators to be sent to both AFB and Company. Within ten (10) days after receipt of such list, each of AFB and Company shall choose three names from the regional list provided by CPR and submit such names to the other party. If any of these names match, such person shall act as the mediator for the dispute. In the event that none of the names match, and if AFB and Company cannot otherwise agree on a mediator, the mediator shall be chosen by CPR. The costs and expenses of the mediation process shall be shared equally by AFB and Company.

(c)     The mediator shall promptly hear presentations from AFB, AFMA and Company in such manner and at such times and locations as shall be determined by the mediator. The mediator may request, and AFB, AFMA and Company shall provide, any documents that in the mediator's sole opinion will assist in resolving the dispute. The mediator shall review the dispute and offer to AFB, AFMA and Company his or her comments on their respective positions. AFB, AFMA and Company may have ex parte communication with the mediator as deemed necessary by either party or the mediator. None of AFB, AFMA or Company shall be bound by any comments, conclusions or decisions of the mediator. All verbal and written communications among AFB, AFMA and Company or among AFB, AFMA or Company and the mediator, issued and prepared in connection with this Section, shall be deemed prepared and communicated in furtherance and in the context of the dispute settlement and shall be exempt from discovery and production and shall not be admissible into evidence in any proceeding for the resolution of this dispute. No legal proceedings for the resolution of the dispute shall be commenced by AFB, AFMA or Company until the conclusion of this mediation, which shall in no event extend past one hundred and twenty (120) days from the receipt of the Notice. Upon conclusion of the mediation, each of AFB and AFMA and Company shall have all rights and remedies available to it at law or in equity; provided, however, that to the fullest extent permitted by law, AFB, AFMA and Company hereby waive their respective rights to trial by jury in any suit, action or proceeding against Company, AFB or AFMA, as the case may be, which may be filed in the courts identified in Section 15.2(g) below.

(d)     The periods set forth in this Section 15.2 may be extended or shortened by mutual agreement of the parties. In no event shall a party who has refused or failed to participate in the dispute resolution process described in this Section 15.2 be permitted to commence legal proceedings without first complying with the provisions of this Section 15.2.

(e)     The parties hereto agree that notwithstanding, and in addition to, the rights and remedies available hereunder, each of AFB and AFMA, on the one hand, and Company, on the other hand, reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief from the courts of the state of Georgia or the federal courts situated in the Northern District of Georgia, to preserve the status quo by enjoining or restraining a party hereto pending mediation hereunder or to compel mediation as provided herein, and the parties hereto acknowledge and agree to the right to seek such relief. The parties hereto expressly agree and acknowledge that seeking relief from the courts as provided in this Section 15.2 shall not be deemed a waiver of any party's right to mediate nor shall the existence or exercise of such right be deemed to be an adequate remedy at law in connection therewith.

(f)     Each party shall bear its own attorneys' fees and expenses and the fees and expenses of other experts or professionals utilized by such party in connection with the mediation provided for herein.

(g)     Each of the parties hereto (including those persons executing the Member Guaranty) hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Court for the Northern District of Georgia and the courts of the state of Georgia over any suit or action to compel mediation in accordance with the provisions of this Section 15 between AFB and Company, and irrevocably agrees that venue is proper in such courts for any such suit or action and that all claims with respect thereto may be heard and determined in either such court. Service of process in any such suit or action may be made in the manner in this Agreement set forth for the giving of notices and the same shall constitute valid personal service for all purposes, each party hereby waiving personal service by other means.

15.3     Each of the parties hereto (including those persons executing the Member Guaranty) hereby irrevocably consents and submits to the personal jurisdiction of the United States District Court for the Northern District of Georgia and the courts of the state of Georgia over all Non-Mediation Matters and hereby agrees that venue is proper in such courts for any Non-Mediation Matter. To the fullest extent permitted by law, AFB, AFMA and Company hereby waive their respective rights to a trial by jury in any Non-Mediation Matter. The parties acknowledge and agree that the rights of AFB and AFMA under this Agreement with respect to the use of the Mark and the System and the enforcement of the in-term and post-term noncompetition agreements of Company are of a specialized and unique character and that immediate and irreparable damage will result to AFB if Company fails or refuses to perform its obligations under this Agreement and, notwithstanding any election by AFB to claim damages from Company as a result of any such failure or refusal, AFB may, in addition to any other remedies and damages available, seek an injunction in a court of competent jurisdiction to restrain any such failure or refusal.

16.     Miscellaneous

16.1     Except as expressly provided herein: (a) neither party in any way constitutes or appoints the other party to be its agent or legal representative for any purpose whatsoever; (b) neither party is granted any right, power, privilege or authority to assume or create any obligation, express or implied, on behalf of, or in the name of the other party, or to make any purchase for the account of, or to bind the other party in any manner or thing whatsoever; and (c) neither party has the right, power, privilege or authority to accept summons or legal process for the other party.

16.2     AFB, AFMA and Company agree, and Company expressly acknowledges, that neither AFB nor AFMA has made any representations, projections or earnings claims to Company with regard to the performance of or sales by the Store. It is expressly agreed between the parties that the results and performance of the Store are matters strictly within the control of Company.

16.3    All notices and other communications hereunder shall be in writing and delivered by one of the following methods of delivery (a) personally, (b) by registered or certified mail, return receipt requested, postage prepaid, (c) by overnight courier or (d) by facsimile transmission, as evidenced by a confirmation mechanically produced simultaneously with the completion of such transmission, in all cases addressed as follows:

AFB:    Athlete's Foot Brands, Inc.
1412 Oakbrook Drive, Suite 100
Norcross, Georgia 30093
Attn: Robert J. Corliss, President and CEO
Telecopy: (770) 514-4905
E-mail: bcorliss@theathletesfoot.com

AFMA:    Athlete's Foot Marketing Associates, LLC
1412 Oakbrook Drive, Suite 100
Norcross, Georgia 30093
Attn: Luana Frederick, Manager of Franchise Administration
        & Paralegal
Telecopy: (770) 514-4905
E-mail: lfrederickbgibbs@theathletesfoot.com

Company:    Turner Phase V LLC
18950 NW 67th Avenue - #204
Miami, Florida 33015
Attn: Delon S. Turner, Member
Telecopy:
E-mail:

Notice shall be deemed received the same day (when delivered personally), upon receipt (when sent by registered or certified mail) or the next business day (when sent by facsimile transmission or when delivered by overnight courier). Any party to this Agreement may change its address to which all communications and notices may be sent hereunder by addressing notices of such change in the manner provided. E-mail addresses are for the convenience of the parties, but e-mail shall not constitute a means of giving notice under this Agreement.

16.4    If any term or provision of this Agreement is held to be invalid or unenforceable by reason of any rule of law or public policy, this Agreement shall be deemed amended to modify such term or provision to make it enforceable or, if not practicable, to delete therefrom the term or provision so held to be invalid or unenforceable and all of the remaining terms and provisions of this Agreement shall remain in full force and effect; provided, however, that in the event that either of AFB or AFMA, in its sole discretion, deems such deleted term or provision to be material to this Agreement, AFB or AFMA shall have the right to terminate this Agreement.

16.5    This written document, including all Exhibits hereto, contains the entire agreement of the parties and supersedes any oral or written representations, inducements or promises not contained herein and may not be modified except by a written instrument signed by the party against whom enforcement is sought. No document or agreement which is not specifically incorporated herein by reference shall be deemed to be part of this Agreement. Documents or agreements referred to herein but not specifically incorporated herein by reference are not part of this Agreement. This Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided, however, that Company may assign this Agreement and its rights hereunder (including, without limitation, an assignment by operation of

- 31 -

law) only upon compliance with the provisions of Sections 11.2 and 11.3 hereof. The rights, duties and obligations of AFB and AFMA hereunder shall be fully assignable by any of AFB and AFMA without the consent of Company. Expiration or early termination of this Agreement shall not affect: (a) the enforceability of any covenants, duties and obligations of any of AFB, AFMA or Company which are in effect prior to such expiration or termination or which, by their express terms, survive such expiration or termination; or (b) the obligation of Company to make payment to AFB or AFMA of any monetary obligations which have accrued but have not been paid at the date of such expiration or termination.

16.6   AFB, AFMA and Company may, by written instrument, unilaterally waive any obligation of or restriction upon the other under this Agreement. No acceptance by AFB or AFMA of any payment by Company and no refusal, neglect or failure of AFB, AFMA or Company to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder or with any specification, standard, operating procedure or rule shall constitute a waiver of any provision of this Agreement.

16.7   All words used herein in the singular shall extend to and include the plural, and vice versa, and all words in any gender shall extend to and include all genders.

16.8   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute duplicate originals.

16.9   In the event of the termination or expiration (without renewal) of the Management Agreement, AFB shall have the right to cause AFMA to assign its rights under this Agreement to a management company engaged by AFB to provide the services which AFMA is obligated to provide hereunder and to substitute such management company for AFMA as a party to this Agreement. Upon such substitution, all references to AFMA in this Agreement shall be deemed to be references to such management company. In such event, AFB shall deliver notice to Company identifying such substitute management company.

COMPANY REPRESENTS THAT IT RECEIVED THE UNIFORM FRANCHISE OFFERING CIRCULAR OF AFB AND AFMA AT LEAST TEN (10) BUSINESS DAYS BEFORE THE TIME FOR MAKING DISCLOSURES OR COMPANY'S FIRST PERSONAL MEETING WITH AFB AND AFMA, THAT IT HAS READ THIS OPERATING AGREEMENT AND SUCH UNIFORM FRANCHISE OFFERING CIRCULAR IN THEIR ENTIRETY AND THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO CLARIFY ANY PROVISIONS AND INFORMATION THAT IT DID NOT UNDERSTAND AND TO CONSULT WITH AN ATTORNEY OR OTHER PROFESSIONAL ADVISOR. COMPANY ACKNOWLEDGES AND AGREES THAT NEITHER AFB NOR AFMA NOR THEIR OFFICERS, EMPLOYEES OR AGENTS HAVE MADE ANY REPRESENTATIONS AS TO THE ACTUAL, AVERAGE, PROJECTED OR FORECASTED SALES, PROFITS OR EARNINGS OF COMPANY.

THE SUBMISSION OF THIS AGREEMENT TO COMPANY FOR EXECUTION DOES NOT CONSTITUTE AN OFFER, AND THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON THE EXECUTION HEREOF BY AFB AND AFMA AND COMPANY AND THE PAYMENT BY COMPANY OF THE CONSIDERATION PROVIDED FOR HEREIN. THIS AGREEMENT SHALL NOT BE BINDING ON AFB AND AFMA UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN AUTHORIZED OFFICER OF EACH OF AFB AND AFMA AT THEIR CORPORATE HEADQUARTERS AND SHALL THEN BE DEEMED TO BE A CONTRACT ENTERED INTO IN THE STATE OF GEORGIA. THE DATE OF EXECUTION BY AFB AND AFMA SHALL BE CONSIDERED THE DATE OF EXECUTION OF THIS AGREEMENT.

COMPANY HAS READ ALL OF THE FOREGOING AGREEMENT AND HEREBY ACCEPTS AND AGREES TO EACH AND ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS THEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ATTEST/WITNESS:

_____
Marty Amschler, Vice President

**ATHLETE'S FOOT BRANDS, INC.**

_____
By: Robert J. Corliss
    President & CEO

ATTEST/WITNESS:

_____
Marty Amschler, Vice President

**ATHLETE'S FOOT MARKETING ASSOCIATES, LLC**

_____
By: Robert J. Corliss
    President & CEO

ATTEST/WITNESS:

_____

**TURNER PHASE V, LLC**

_____
By: Delon S. Turner

_____
Taxpayer Identification Number

- 33 -

## MEMBER GUARANTY

The undersigned, being all of the members of Company (hereinafter referred to as the "Guarantors") in consideration of the premises and in order to induce AFB and AFMA to execute the Operating Agreement with Company to which this Guaranty is attached, and intending to be legally bound hereby, jointly and severally, unconditionally, irrevocably, personally and absolutely guaranty the punctual and full payment of all obligations owed by Company to AFB or any of its Affiliates, including, without limitation, all initial fees, royalty fees, Marketing Support Fund contributions interest and costs and expenses of collection owed by Company to AFB or any of its Affiliates pursuant to the Operating Agreement.

Each of the Guarantors hereby waives any right to require any action or proceeding against Company on the Operating Agreement or otherwise to require AFB to exhaust any and all remedies against Company before proceeding against the Guarantors, or any of them, on this Guaranty.

This Guaranty is a continuing Guaranty and shall remain in full force and effect regardless of any interruption in the business relationship among AFB, AFMA and Company.

Each of the Guarantors hereby agrees not to communicate or divulge to or use for the benefit of any other person or entity, any information or knowledge concerning the business of AFB or the System which such person may acquire by virtue of the operation of the Store by Company under the Operating Agreement, nor shall any such person do any act prejudicial or injurious to the business of AFB.

Each of the Guarantors agrees to deliver to AFMA the annual balance sheet provided for in Section 3.3(a) of the Operating Agreement.

Each of the Guarantors hereby agrees not to sell, transfer or otherwise dispose of his stock or other ownership interests in Company without the prior written consent of AFB and without complying with the provisions of Section 11.2 of the Operating Agreement. This Member Guaranty shall remain in effect and be binding upon each of the undersigned notwithstanding the fact that one or more of the undersigned may no longer be a member of Company.

Each of the Guarantors, by execution of this Guaranty, agrees to honor and abide by the restrictive covenants set forth in Sections 7.1(bb) and 12.2 of the Operating Agreement, regardless of any interruption in the business relationship among AFB, AFMA and Company, and regardless of the cessation of any affiliation between Company and any Guarantor. Each of the Guarantors confirms his intent to be legally bound by such restrictive covenants and that such covenants constitute valid, binding and legally enforceable obligations of each of the Guarantors.

The provisions of Section 15 of the Operating Agreement are hereby incorporated in this Guaranty by reference as if fully set forth herein. Each of the Guarantors, by execution of this Guaranty, agrees to be bound by the provisions of Section 15 of the Operating Agreement and hereby consents to the jurisdiction and venue provisions set

forth in said Section 15. Each of the Guarantors hereby agrees that any and all claims by AFB or AFMA against any Guarantor may be brought as provided in said Section 15.

Dated this 1st day of December , 2005, effective as of March 28, 2005.

Delon S. Turner
Social Security Number 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
Residence Address:
18950 NW 67th Avenue - #204
Miami, Florida  33015

## LIST OF EXHIBITS

| Exhibit | Subject | Section Reference |
|---------|---------|-------------------|
| A | Mark | First WHEREAS clause and 1.1(p) |
| B | AFB Trade Dress | 1.1(a) |
| C | Checklist of Store location information | 2.3 and 7.1(q)(ii) |
| D | Net Sales Report | 3.2 |
| E | Confidentiality Agreement | 7.1(z) |

## EXHIBIT A

### MARK



## EXHIBIT B

## AFB TRADE DRESS

The following items are considered a part of the trade dress of a The Athlete's Foot® store. All usage of such item must cease immediately upon termination or expiration of the Operating Agreement. All of such items must be disposed of from the premises as set forth below when disassociation takes place.

- Exterior Sign

- Fit Print System (Scanner)

- Inventory Control System

- Cash Wrap

- If applicable, special order carpet bearing the Mark

- All interior signage regardless of whether it contains the Mark

- All merchandise bags bearing the Mark

- All seating

- Wall display systems purchased (grid with lighted acrylic)

- All merchandise towers purchased and other display fixtures

- All private label product whether footwear, clothing, or accessories purchased through the AFB programs

- All uniforms bearing the Mark

- Any wallpaper or wall covering bearing the Mark

- All point of purchase materials bearing the Mark

- All category and gender signage bearing the Mark

- All sale tags and other tags ("clearance, etc.") bearing the Mark

- Other display fixtures including rolling bins

- Telephone listings as The Athlete's Foot® must be changed

All binders, manuals, and other publications must be sent back to AFB at its corporate headquarters.

All items of furniture, fixtures, equipment and supplies must be: (a) destroyed; (b) returned to AFB at no cost to AFB; or (c) sold to another approved franchisee of AFB.

**EXHIBIT C**

**CHECKLIST OF STORE LOCATION INFORMATION**

1.  SITE PLAN OF THE POTENTIAL LOCATION SHOWING:
    - EXACT LOCATION OF SPACE
    - SIZE OF SPACE

2.  DEMOGRAPHICS

3.  PICTURES OF THE LOCATION

4.  A COPY OF THE LEASE

Case 1:08-cv-22582-KMM   Document 1   Entered on FLSD Docket 09/17/2008   Page 82 of 95

# ATHLETE'S FOOT
# MONTHLY SALES REPORT

**EMAIL THIS REPORT TO:**

SalesReports@theathletesfoot.com
or type your data, print, THEN fax to:
(770) 514-4921
or (770) 514-4903  Attn: Accounts Receivable
Questions? Call Accounts Receivable
**1-800-524-6444**

**Month of**

**Date Due:**          (10th of the following month)

TOTALS

| | | | | | | |
|---|---|---|---|---|---|---|
| **TAF Store Numbers** | | | | | | |
| **Owner's Name** | | | | | | |
| **Store Locations** | | | | | ' | |
| **City, State** | | | | | | |

| | | | | | | TOTALS |
|---|---|---|---|---|---|---|
| GROSS SALES | | | | | | - |
| - Sales Tax | | | | | | - |
| = NET SALES | - | - | - | - | - | - |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Royalty %** | | | | | | |
| **Royalty Due** | - | - | - | - | - | - |

| | Total Royalty | - |
|---|---|---|
| **Remit Royalty check to:**   Athlete's Foot Brands, Inc.   PO Box 409673   Atlanta, GA  30384-9673 | Date Paid | |
| | Check # | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **MSF %** | | | | | | |
| **MSF Due** | - | - | - | - | - | - |

| | Total MSF | - |
|---|---|---|
| **Remit MSF check to:**   The Athlete's Foot   P.O BOX 403554   ATLANTA, GA 30349 | Date Paid | |
| | Check # | |

FAX to: (770) 514-4921 or 4903

updated 10/27/05 LR

**EXHIBIT E**

**CONFIDENTIALITY AGREEMENT**

In consideration of my business relationship with _____ ("Company"), a franchisee of Athlete's Foot Brands, Inc. ("AFB"), and Athlete's Foot Marketing Associates, LLC ("AFMA"), I agree that:

1.    I will not use or duplicate or allow others to use or duplicate any of the knowledge, know-how and expertise I receive pursuant to my business relationship with a THE ATHLETE'S FOOT® store for any reason other than in connection with such business relationship.

2.    I will not, during the term of such business relationship, or after termination thereof, communicate or divulge to anyone, any information or knowledge concerning the System, products, services, standards, techniques, suppliers and other information or material, in whatever media expressed, which AFMA, AFB or Company may designate as confidential, nor shall I disclose or divulge in whole or in part any trade secrets, pricing policies, or operating procedures of AFB or AFMA and, used with respect to a THE ATHLETE'S FOOT® store, unless such information is generally known and in the public domain.

3.    I will exercise the highest degree of diligence and make every effort to maintain the absolute confidentiality of all trade secrets and proprietary rights during and after the term of such business relationship.

4.    Should any provision of this Agreement be construed or declared invalid, such decision shall not affect the validity of any remaining portion which shall remain in full force and effect as if this Agreement had been executed with such invalid portion eliminated. If any restriction contained in this Agreement is deemed too broad to be capable of enforcement, a court of competent jurisdiction is hereby authorized to modify or limit such restriction to the extent necessary to permit its enforcement. All covenants contained in this Agreement, shall be interpreted and applied consistent with the requirements of reasonableness and equity.

5.    This Agreement may be enforced by either AFB or AFMA or its successors and assigns, or Company, and I understand that it is intended to protect the legitimate business interests of AFB and AFMA, its successors and assigns, and Company. If suit is brought to enforce this Agreement, I agree to pay reasonable attorney's fees and expenses incurred by the party bringing the suit.

Signed:_____

Print Name:_____

Date:_____

ATHLETE'S FOOT BRANDS, LLC, et al. v.
TURNER PHASE IV, LLC, et al.
CASE NO.

EXHIBIT E

Case 1:08-cv-22582-KMM   Document 1   Entered on FLSD Docket 09/17/2008   Page 84 of 95

## OPERATING AGREEMENT

MADE this 31ˢᵗ day of ~~May~~ July 8ᵗʰ, 2003, by and between ATHLETE'S FOOT MARKETING ASSOCIATES, LLC, a Delaware limited liability company (hereinafter referred to as "AFMA"), and TURNER PHASE IV, LLC, a Florida limited liability company (hereinafter referred to as "Company").

WHEREAS, AFMA owns and uses the trademark and service mark THE ATHLETE'S FOOT® per se and in the form shown on Exhibit A attached hereto; and

WHEREAS, AFMA owns and uses a distinctive business format and has assembled several items of equipment designed specifically for use in the operation of specialty retail athletic footwear stores under the Mark (as hereinafter defined); and

WHEREAS, Company desires to obtain the rights to use the Mark and to enjoy the benefits of the System (as hereinafter defined) and AFMA is willing to grant such rights on the terms and conditions hereinafter provided;

NOW, THEREFORE, in consideration of the mutual covenants and obligations herein contained, and intending to be legally bound, the parties hereto agree as follows:

1.    Definitions

       1.1    As used herein, the following terms shall have the following meanings:

              (a)    "Affiliate" shall mean an entity controlling, controlled by or under common control with another person or entity, as applicable.

              (b)    "AFMA Trade Dress" shall mean the combination of the distinctive and identifying interior and exterior store layout, signage, design and decor features used by AFMA as part of the uniform appearance of all stores operating under the Mark, including, without limitation, the items of decor, fixtures and accessories described on Exhibit B attached hereto, as the same may be modified from time to time by AFMA.

              (c)    "Approved Goods" shall mean those items of athletic footwear, "brown shoes" (casual shoes not specifically designed for athletic activity) and merchandise related to athletics and physical and mental well-being and the manufacturers and/or suppliers thereof which:

                     (i)    have been approved by the Goods Selection Committee of AFMA for sale in the Store as identified on a list of such goods published by AFMA, as said list may be amended from time to time by AFMA including, without limitation, Private Label Goods; and

(ii)     Company is eligible to carry in the Store based upon compliance with eligibility criteria set forth in the Manual of Policies and Standards.

(d)     "Confidential Information" shall mean all information, data, documents, records and other materials, written, oral or electronic, relating to the business of AFMA and the conduct of business under the Mark which is non-public and the property of AFMA or any of its Affiliates including, without limitation, trade secrets concerning the business and affairs of AFMA or its Affiliates, the Operations/Training Manuals, the Manual of Policies and Standards, the forms, systems and procedures for the conduct of business under the Mark, know-how, product specifications, past, current and planned research and development, price lists, pricing policies, market studies, systems, store designs, vendor lists.

(e)     "Company's Area of Non-Competition" shall mean: (i) Company's Area of Responsibility or the area within a ten (10) mile radius around the premises of the Store, whichever is greater; and (ii) the area within a ten (10) mile radius around all other stores operating under the Mark on the date upon which this Agreement expires or is terminated.

(f)     "Company's Area of Responsibility" shall mean the geographic area encompassed by a one (1) mile radius around the premises of a shopping mall, shopping center or storefront located in Broward County, Florida or Dade County, Florida as mutually agreed upon between AFMA and Company pursuant to Section 2.3 hereof, such agreement to be evidenced by an amendment to this Agreement specifically identifying such premises. Notwithstanding the foregoing, the premises of theme parks, amusement parks, airports and sports arenas otherwise located in Company's Area of Responsibility shall be excluded from Company's Area of Responsibility.

(g)     "Executive" shall mean the individual designated by Company to AFMA as having responsibility for the overall decision-making and strategy for the business to be operated pursuant to this Agreement and who may also be the Manager.

(h)     "Goods" shall mean all items of merchandise offered for sale or sold by or through the Store or by any of Company's representatives.

(i)     "Goods Selection Committee" shall mean those persons employed as members of the merchandise division of The Athlete's Foot Stores, Inc., an affiliate of AFMA, and as members of the franchise operations division of AFMA who are from time to time appointed by AFMA to serve as members of the Committee.

(j)     "Inventory Control System" shall mean the system of computer hardware and software used for tracking purchase orders and receipts, for updating inventory, for generating sales reports, for inventory management and for the analysis of financial information relating to the operation of the Store which is to be used in the Store.

(k)     "Location Identification Period" shall have the meaning given it in Section 2.3 below.

(l) "Manager(s)" shall mean the individual(s) designated by Company to AFMA as having responsibility for the day-to-day management and operation of the Store.

(m) "Manual of Policies and Standards" shall mean the manual prepared by AFMA containing its policies and standards governing relationships between stores operated under the Mark and AFMA customers, employees and other stores operated under the Mark, as the same may be modified, revised or updated from time to time by AFMA.

(n) "Mark" shall mean the trademark and service mark THE ATHLETE'S FOOT® per se and in the form shown on Exhibit A attached hereto as well as all other trademarks, service marks, logos, emblems and other designs of AFMA, as may be adopted by and authorized for use in writing by AFMA from time to time during the term of this Agreement.

(o) "Marketing Support Fund" shall have the meaning given it in Section 6.1(c)(i).

(p) "Net Sales" shall mean the sales price of all Goods sold from the Store (including the face amount of all gift certificates which are to be included at the time of redemption and the full sales price of all layaways, which is to be included at the time of the first payment), whether for cash (including checks) or on credit, whether collected or not, and whether made by Store personnel or by vending machines, deducting therefrom the following:

(i) the sales price of all Goods purchased at the Store which are returned to the Store by customers and accepted for full credit, or the amount of discounts and allowances made thereon if less than full credit is given;

(ii) (A) the resale price of all Goods previously purchased from stores operated by other franchisees of AFMA which are returned by customers to the Store under the store exchange program of AFMA and which have been accepted by Company for full credit;

(B) the amount of the reimbursement or credit received by Company from the franchisee of AFMA which made the original sale for Goods previously purchased from stores operated by other franchisees of AFMA which are returned to the Store under the store exchange program of AFMA and which have been accepted by Company for full credit thereunder; and

(iii) sums and credits received in the settlement of claims for loss of or damage to Goods.

(q) "Operations/Training Manuals" shall mean the manuals prepared by AFMA containing instructive materials regarding the methods of operation for stores operated under the Mark and instruction in such methods of operation, as the same may be modified, revised or updated from time to time by AFMA.

(r)    "Private Label Goods" shall mean any line or lines of private label athletic footwear and footwear accessory products and athletic apparel developed by AFMA and branded with any trademark selected by AFMA.

(s)    "Private Label Goods Program" shall mean the program established by AFMA whereby franchisees of AFMA are offered the opportunity to purchase Private Label Goods from AFMA or third-party suppliers designated by AFMA.

(t)    "Member Guaranty" shall mean the Member Guaranty in the form attached to this Agreement as an additional signature page.

(u)    "Store" shall be the business establishment or other location opened and operated by Company as a specialty retail athletic footwear store under the Mark in Company's Area of Responsibility pursuant to the terms of this Agreement.

(v)    "System" shall mean the license of the Mark and access to the distinctive business format, Confidential Information and AFMA Trade Dress for the operation of specialty retail athletic footwear stores specializing in the sale of athletic footwear and footwear accessory products, including, without limitation, assistance in establishing accounts with vendors of footwear and footwear accessory products, which has been developed by AFMA for use by persons or entities approved by AFMA, as the same may be changed, improved, modified or further developed from time to time.

2.    Grant of Rights

2.1    On the terms and subject to the conditions set forth in this Agreement and in consideration of the fees to be paid by Company hereunder:

(a)    AFMA hereby grants to Company a license to use the Mark in Company's Area of Responsibility solely to identify one (1) specialty retail athletic footwear store, the merchandise sold through such retail store and the business conducted through such retail store;

(b)    AFMA hereby grants to Company the right to use and enjoy the benefits of the System solely in connection with the operation of the business conducted through such retail store; and

(c)    AFMA hereby grants to Company the right to open and operate one (1) Store identified by the Mark and using the System.

2.2    Company hereby accepts the foregoing grant of the license of the Mark, the right to use and enjoy the benefits of the System, and the right to open and operate one (1) Store identified by the Mark and using the System, all upon the terms and conditions set forth herein, and agrees that all of such rights are conditioned upon compliance by Company with the terms and conditions of this Agreement.

- 4 -

2.3     For a period of one hundred eighty (180) days after the date of this Agreement (the "Location Identification Period"), Company shall use its best efforts and its own resources to identify a location for the Store, which location is mutually acceptable to both AFMA and Company.  Upon the request of Company, AFMA will provide assistance to Company in its efforts to identify a location for the Store.  As a condition precedent to accepting any location identified by Company, Company shall have delivered to AFMA the information with respect to such location specified on <u>Exhibit C</u> attached hereto.  AFMA reserves the right to reject any proposed location which, in its judgment, would encroach upon the market area of any existing store operating under the Mark or upon the rights of any existing franchisee of AFMA.  Company acknowledges that in reaching such judgment, AFMA may consider both objective and subjective factors, and that AFMA may give varying degrees of weight to such factors.  In the event such mutually acceptable location is identified within the Location Identification Period, AFMA and Company will enter into an amendment to this Agreement to specify the description of "Company's Area of Responsibility."  The minimum Net Sales of the Store referenced in Section 7.1(f) hereof shall also be specified at such time if not previously agreed upon.  If, at the end of the Location Identification Period, AFMA and Company have not been able to mutually agree upon a location for the store, a description of Company's Area of Responsibility and the minimum Net Sales of the store, Company shall have the option to: (a) extend the Location Identification Period for an additional period not to exceed sixty (60) days; or (b) terminate this Agreement by notice to AFMA prior to the end of the Location Identification Period.  If no such notice is given by Company, Company shall be deemed to have elected to extend the Location Identification Period.  If Company elects to extend the Location Identification Period and at the end of such extension period a mutually acceptable location has not been identified, this Agreement shall terminate automatically.  In the event this Agreement is terminated pursuant to the foregoing provisions, and upon the return to AFMA of any and all written materials of any kind previously delivered to Company by AFMA, AFMA shall promptly refund to Company the sum of Thirty-Two Thousand Dollars ($32,000) from the initial fee paid by Company pursuant to Section 3.1(a) below and AFMA shall retain the sum of Three Thousand Dollars ($3,000) as reimbursement for its expenses in qualifying Company as a franchisee and in assisting Company in identifying a mutually acceptable location for the Store.

3.      <u>Fees; Reports; Payment</u>

3.1     For the Store to be opened and operated by Company, Company agrees to pay the following to AFMA:

(a)     an initial fee of Thirty-Five Thousand Dollars ($35,000) for the Store to be opened by Company under this Agreement, which shall be due and payable upon execution of this Agreement;

(b)     (i)     a royalty fee for the use of the Mark and the System in an amount equal to five percent (5%) of the Net Sales of Company through the Store during the term of this Agreement, which shall be paid on a monthly basis and shall be due and payable within ten (10) calendar days after the close of each calendar month during the term of this Agreement; and

- 5 -

(ii)  a royalty fee for the use of the Mark and the System in an amount equal to ten percent (10%) of the Net Sales of Company through off-Store premises sales of Goods made without the prior authorization of AFMA as provided in Section 7.1(bb) hereof; and

(c)  a contribution to the Marketing Support Fund (as defined in Section 6.1(c)(i)) in an amount equal to a percentage of the Net Sales of Company through the Store during the term of this Agreement, as shall be established annually by AFMA, which shall be paid on a monthly basis and shall be due and payable within ten (10) calendar days after the close of each calendar month during the term of this Agreement.  For calendar year 2003, AFMA has set the rate of contribution at 6/10 of one percent (.6%) of the Net Sales of Company. Although the present intention of AFMA is that such percentage rate of contribution will not exceed one percent (1%) of the Net Sales of Company, at its option, at any time after December 31, 2003, upon thirty (30) days' advance written notice to Company, AFMA shall have the right to raise the contribution to the Marketing Support Fund to a rate of up to two percent (2%) of Net Sales.

3.2  During the first ninety (90) days of operation of the Store to be opened hereunder, Company shall make a weekly report by telephone to AFMA headquarters of the Store's Net Sales; provided, however, that in the event Company purchases the Store from AFMA or one of its Affiliates, such weekly reports shall be made during the first year of the operation of the Store.  Within ten (10) calendar days after the close of each calendar month during the term of this Agreement, Company shall submit to AFMA, along with the royalty fee and the contribution to the Marketing Support Fund for such month, an unaudited statement of the Net Sales of the Store for each such month, in the form of Exhibit D attached hereto, prepared in accordance with generally accepted accounting principles.  Company agrees to maintain such records and accounts, including, without limitation, all sales slips, bank statements and such other sales records, as an independent certified public accountant would need to examine in order to certify Company's annual statement of Net Sales pursuant to generally accepted auditing principles.  AFMA shall have the right, upon forty-eight (48) hours' prior written notice, to examine such records and accounts at mutually agreeable times during normal business hours  Such records and accounts may be disposed of by Company at any time after the fifth anniversary of the end of the calendar year for which such records and accounts have been maintained.  In the event that, pursuant to the terms of any lease of Store premises, the lessor conducts an audit of Company's Net Sales for purposes of verifying the percentage rent paid by Company to such lessor, Company shall deliver a copy of such audit report to AFMA within a period of fifteen (15) days from the date of receipt by Company of such audit report.

3.3  (a)  Within ninety (90) days following the end of each fiscal year of Company, Company shall provide AFMA with financial statements prepared by a reputable accounting service in accordance with generally accepted accounting principles which shall consist of, at a minimum, (i) a balance sheet of Company as of the last day of the fiscal year and a balance sheet of each person who has executed the Member Guaranty as of the last day of the preceding calendar year; and (ii) an income statement of Company for the fiscal year.  In addition, at the same time, Company shall provide a statement setting forth, in detail, the Net Sales of the Store operated by Company during any portion of such fiscal year and a report of the

- 6 -

expenditure of the Annual Capital Expenditure Amount (as defined in Section 7.1(q)(i) below) and the advertising expenditures required by Section 7.1(j)(ii), the form of which appears in the Manual of Policies and Standards. In the event that, pursuant to the terms of any lease of Store premises, Company is required to provide a lessor with a statement substantially similar to a statement required herein prepared by a reputable accounting service, then such statement may be delivered to AFMA in substitution for the corresponding statement provided for herein. Company shall give AFMA notice of its intention to provide the alternative statement along with a copy of the applicable lease provision.

(b)     Within ninety (90) days following the end of each fiscal year of Company and based upon the sales figures as reported on the financial statements of Company which are provided to AFMA pursuant to Section 3.3(a) hereof, Company and AFMA shall make a year-end adjustment to the amount of royalty fees and Marketing Support Fund contribution paid by Company during such fiscal year in an amount necessary to cause the total royalty fees and Marketing Support Fund contribution actually paid by Company for such fiscal year to be in an amount equal to the amount to be paid for such year pursuant to Sections 3.1(b) and (c) above. AFMA shall refund to Company or Company shall pay to AFMA, as the case may be, the amount necessary to accomplish such adjustment within ten (10) days of the completion of the calculation of such adjustment.

(c)     (i)     During the first twelve months in which the Store is open and operating, Company shall deliver to AFMA, along with each monthly statement of Net Sales to be delivered pursuant to Section 3.2, a computer diskette containing all of the information on the Inventory Control System (the "Inventory Control System Data") as of the close of business on the last day of the preceding month. After the first twelve months in which the Store is open and operating, within ten (10) days after a request from AFMA, Company shall deliver to AFMA a computer diskette containing the Inventory Control System Data as of the date of receipt by Company of AFMA's request.

(ii)     On or before September 1 in each year, Company shall deliver to AFMA a written report containing Company's sales forecast for the next calendar year. Such report shall be submitted on an Annual Sales Forecast Form which shall be provided to Company by AFMA. In addition, at the same time, Company shall deliver to AFMA a certificate of insurance showing that the insurance coverage required under Section 7.1(m) hereof is then in effect in the name of Company.

(d)     Along with the annual financial statements to be delivered by Company to AFMA pursuant to Section 3.3(a), Company shall deliver to AFMA a complete list of the vendor account numbers established or maintained by Company during the preceding fiscal year. At the request of AFMA, Company shall submit to AFMA a written report of Company's annual purchases for the preceding fiscal year of Company, which purchases shall be listed by vendor.

(e)     Upon five (5) days written notice to Company, AFMA shall have the right to audit or cause to be audited, at any time up to five (5) years after the close of a fiscal year, the books and records of Company with respect to the Store for such fiscal year. In the

event any such audit shall disclose an understatement of the Net Sales for any fiscal year(s), Company shall pay to AFMA, within fifteen (15) days after receipt of the audit report, the royalty fees and contributions to the Marketing Support Fund due on the amount of such understatement. In the event such understatement for any fiscal year(s) shall be two percent (2%) or more of the Net Sales for such fiscal year(s), Company shall pay to AFMA, within fifteen (15) days after receipt of the audit report, the royalty fees and contributions to the Marketing Support Fund due on the amount of the understatement, together with interest as provided in Section 3.6 from the date such payments were due and payable, and Company shall reimburse AFMA for the cost of the entire audit, including, without limitation, the charges of any independent accountant and the compensation of employees of AFMA and reasonable travel costs including food and lodging (the "Audit Costs"). In the event such understatement for any fiscal year(s) shall be in excess of five percent (5%) of the Net Sales for such fiscal year(s): (i) AFMA shall have the right to collect royalty fees and contributions to the Marketing Support Fund on the amount of such understatement at the rate of ten percent (10%), together with interest as provided for in Section 3.6 from the date the royalty fee and contributions to the Marketing Support Fund were due and payable; (ii) Company shall reimburse AFMA for the Audit Costs; and (iii) AFMA shall have the right to terminate this Agreement. AFMA's right to audit the books and records of Company as provided for above shall survive the expiration or termination of this Agreement.

      3.4    At the request of AFMA, Company shall submit to AFMA a copy of the state sales tax reports as filed by Company with appropriate state authorities. Such reports shall be submitted to AFMA within three (3) days of the request therefor and, upon request of AFMA, Company shall regularly submit such reports to AFMA within three (3) days of their submission to state authorities. All copies submitted to AFMA shall be certified by the Manager to be a true, correct and complete copy of the report submitted to state authorities by Company.

      3.5    All initial fees, royalty fees, contributions to the Marketing Support Fund and invoices for merchandise and supplies shall be due and payable on the dates specified herein or therein regardless of any disputes or controversies between AFMA and Company and/or Company and third parties. In the event of any such dispute or controversy, Company shall have all of the rights and remedies available to it under this Agreement or at law or in equity, except that Company shall not have the right to withhold payment of any amounts due and payable to AFMA while such dispute or controversy is pending.

      3.6    Initial fees, royalty fees, contributions to the Marketing Support Fund and invoices for furniture, fixtures, signs, software, supplies, equipment and merchandise purchased from AFMA, if any, not paid to AFMA when due shall bear interest at the rate of one and one-half percent (1.5%) per month, or the highest rate of interest permitted by law, whichever is less. In the event payment of any royalty fee or Marketing Support Fund contribution or any invoice from AFMA becomes more than sixty (60) days past due, AFMA may, in its sole discretion, send furniture, fixtures, signs, software, supplies, equipment and merchandise on a cash-on-delivery basis or may suspend shipments of such items to Company until all such fees and/or invoices are paid. In addition, in the event AFMA is required to commence and prosecute formal legal proceedings for the collection of such fees and/or invoices and AFMA is successful in the collection of such fees and/or invoices, whether by settlement and compromise or by decision of

a court provided for in Section 15 hereof, Company shall reimburse AFMA for any and all reasonable costs and expenses incurred by AFMA in connection with such legal proceedings, including, without limitation, reasonable attorneys' fees and the filing fees and other costs incurred by AFMA in bringing such legal proceedings.

3.7     Prior to the opening of the Store, Company shall establish a separate account at a banking institution selected by Company which shall have capability for automatic funds transfer (the "Automatic Funds Transfer Account") and shall provide AFMA with all information regarding the Automatic Funds Transfer Account as is necessary for AFMA to establish an automatic funds transfer program with respect to the Automatic Funds Transfer Account. Company shall cooperate with AFMA as necessary to establish the automatic funds transfer program and to authorize AFMA to direct automatic funds transfers from the Automatic Funds Transfer Account on the tenth day of each calendar month. If not previously paid to AFMA, Company shall deposit into the Automatic Funds Transfer Account, on or before the tenth calendar day of each calendar month, cash in an amount equal to the aggregate amount of the royalty fee and contribution to the Marketing Support Fund for the preceding calendar month. To the extent not previously paid by Company, Company hereby authorizes AFMA to direct a transfer of funds from the Automatic Funds Transfer Account to AFMA in an amount equal to the aggregate amount of the royalty fee and Marketing Support Fund Contribution calculated on the basis of the most recent statement of monthly Net Sales delivered by Company to AFMA (whether or not for the immediately preceding calendar month).

4.     Other Stores in Company's Area of Responsibility

Except as expressly set forth in this Section 4, AFMA agrees that it will neither open and operate any specialty retail athletic footwear stores under the Mark or using the System located in Company's Area of Responsibility nor grant any rights to any third party for the use of the Mark or the System for the operation of specialty retail athletic footwear stores located in Company's Area of Responsibility. AFMA reserves, on behalf of itself and its Affiliates, the right to use the Mark and the System in any and all ways other than by the operation of a specialty retail athletic footwear store under the Mark located in Company's Area of Responsibility (e.g., sales via the Internet, catalog sales or other direct purchase programs) and to license others (including, without limitation, any Affiliates of AFMA) to open stores operating under the Mark at any location outside Company's Area of Responsibility, in both cases, even if such use and such stores are geographically proximate to the Store and compete for customers within Company's Area of Responsibility. AFMA may license others (including any Affiliates of AFMA) to open stores operating under the Mark on the premises of theme parks, amusement parks, airports and sports arenas located in Company's Area of Responsibility which may compete for customers within Company's Area of Responsibility.

5.     <u>Operation and Management of Store</u>

        5.1    At Company's sole risk, AFMA shall:

        (a)    at Company's request, advise Company as to site selection, lease negotiation, store layout, physical structure, leasehold improvements and interior design for the Store;

        (b)    at Company's request, advise Company as to initial orders of merchandise and types of initial and subsequent inventories;

        (c)    at Company's request, advise Company as to establishment and terms of business relations with major suppliers of athletic footwear and footwear accessory products;

        (d)    create, prepare and make available to Company in connection with the opening of the Store advertising materials used by AFMA in connection with the Mark; and

        (e)    at Company's request, advise Company as to its own merchandising, advertising, cost control and other ways of doing business, including but not limited to: establishing monthly sales plans, turnover rate, assortment planning by month and category, writing and processing purchase orders, profit and loss analysis, maintaining gross margins, cash flow analysis, in-store signage, lighting, office organization, bookkeeping, daily cash reporting, journal entry, sales tracking, personnel administration, employee interviewing, hiring and termination techniques, product knowledge, salesmanship, management information systems, training materials including product training systems and product training manuals and videos, furniture and fixtures, insurance, private label products, security systems, supplies, and use of the Inventory Control System.

        5.2    With the exception of Company's obligations under this Agreement and matters relating to the use of the Mark and the System and the appearance and trade dress of the Store, the advice and recommendations provided by AFMA are subject to the independent business judgment of Company and Company shall not be obligated to follow such advice and recommendations.

6.     <u>AFMA's Representations, Warranties and Covenants</u>

        6.1    AFMA hereby represents, warrants, covenants and agrees with Company as follows, which representations, warranties and covenants shall be in effect during the entire term of this Agreement:

        (a)    AFMA has full right and authority to license the use of the Mark to Company in Company's Area of Responsibility to identify retail stores and goods sold through such retail stores, such as athletic footwear and footwear accessory products. AFMA has full right and authority to license the Mark and the System to Company for use in accordance with the terms of this Agreement. AFMA has licensed and will continue to license the use of the Mark and the System to others outside of Company's Area of Responsibility.

- 10 -

      (b)      AFMA shall provide a training program to the Executive, the initial Manager of the Store and the individuals who succeed Managers to explain AFMA's forms, systems and procedures for Store operation. Training will include the loan to Company of the Operations/Training Manual and the Manual of Policies and Standards. Such training shall include the "Fit Technician Training Program" (consisting of at least one (1) day of seminar training) and such other training programs as AFMA shall implement from time to time. The initial training program for the Executive and the initial Manager of the Store prior to the opening of the Store and for individuals who succeed the Manager shall consist of a minimum of five (5) days of training which shall be held at AFMA's offices. In addition, AFMA shall provide mandatory supplemental training to the Executive, the initial Manager of the Store and to individuals who succeed the Manager which consists of one day of seminars in the "Master Fit Program" of AFMA held from time to time at various locations in the United States, including AFMA's offices, to provide basic education to the Executive and such Managers on leg and foot anatomy, athletic injuries and medical conditions with implications for footwear, and to inform Company, through the Executive and such Managers, about new footwear technologies, sales techniques and other footwear issues. The "Master Fit Program" is conducted frequently throughout each year, although there is no fixed schedule. At the option, and upon the request of Company, AFMA shall provide a minimum of one (1) day and a maximum of three (3) days of actual in-store training and support for the Executive and such Managers in connection with the opening of the Store which will be conducted at a store operating under the Mark. AFMA shall provide training for the person(s) designated by Company as the Executive and Manager. The Executive and Manager shall receive training in order to prepare the Executive and Manager for implementing and administering AFMA's store training system and standards in the course of training other employees of Company. AFMA shall loan to Company for use by the Executive and Manager one copy of the Manual of Policies and Standards, the Operations/Training Manual and other training-related manuals and programs which will include information for implementation of the store training system and the administration of store standards. There shall be no charge for any of the foregoing training programs; provided, however, that Company shall be responsible for the transportation and living expenses incurred by the Executive and Managers and any other representatives of Company in attending any such training program. Representatives of Company in addition to the Executive and the Manager shall be permitted to attend such initial training program; provided, however, AFMA reserves the right to limit training program participation to three (3) representatives from Company in any one training session. All training to be provided to the Executive and Managers shall be conducted at the regularly scheduled training sessions of AFMA.

      (c)    (i)     AFMA shall maintain and administer a marketing support fund (the "Marketing Support Fund") for the purposes of providing advertising and marketing materials such as public relations and marketing programs, in-store promotions and signage packages and market research for the benefit of Company and all stores operating under the Mark in the continental United States and Canada (collectively, the "Marketing Support Programs") which will promote consistency in advertising and marketing at the local level through the use of materials professionally produced through expenditures from the Marketing Support Fund. AFMA shall maintain a separate accounting for the proceeds of the Marketing Support Fund. AFMA shall create and direct the Marketing Support Programs in the exercise of its sole discretion and shall make disbursements from the Marketing Support Fund for the